United States Court of Appeals,

Fifth Circuit.

No. 91–4318.

SANDEFER OIL & GAS, INC., et al., Plaintiffs–Appellees,

v.

Deanne Lounsberry DUHON and Freddie Paul Lounsberry, Defendants–Appellants.

June 4, 1992.

Appeal from the United States District Court For the Western District of Louisiana.

Before POLITZ, Chief Judge, BROWN and SMITH, Circuit Judges.


POLITZ, Chief Judge:

Deanne Lounsberry Duhon and Freddie Paul Lounsberry appeal an adverse summary judgment in favor of Sandefer Oil & Gas, Inc., Tex/Con Oil & Gas Co., and SHV Oil & Gas Company. Concluding that the district court erred in its interpretation of the mineral lease at issue, we reverse and remand.


Background

The focus of this litigation is an oil, gas and mineral lease covering property in Vermilion Parish, Louisiana, executed on January 31, 1985. The lease contains a standard habendum clause with a primary term of three years. The lease also contains a typed-in provision known as a horizontal "Pugh" clause,[1] or a bottomhole severance clause, which is the subject of this controversy.

That clause, contained in paragraph 17 of the lease, provides in relevant part that:

[1] As noted by our colleague, Judge Albert Tate, Jr., when Chief Judge of the Louisiana Third Circuit Court of Appeal, in *Fremaux v. Buie,* 212 So.2d 148, 149 n. 1 (La.App.1968), the "clause is named after its creator, the late Lawrence G. Pugh, Sr., a distinguished attorney of Crowley, Louisiana. Its purpose is to void the consequences of the holding of Louisiana mineral law, *see Hunter Co. v. Shell Oil Co.,* 211 La. 893, 31 So.2d 10 (1947) and following, that production from a unit including a portion of a leased tract will maintain the lease in force as to all the lands covered by the lease." (Law Review citations omitted.)

After expiration of the primary term, this lease will terminate automatically as to all horizons situated 100 feet below the deepest depth drilled (a) from which a well located on the land or acreage pooled therewith is producing in paying quantities, or (b) in which there is completed on the land or acreage pooled therewith a shut-in gas well which cannot be produced because of lack of market, marketing facilities, or because of governmental restrictions, whichever is the greater depth.

Before expiration of the primary term, the lessees drilled the Marceaux No. 1 well on land pooled with a portion of the lease tract. The Marceaux No. 1 well was drilled to a total depth of 17,609 feet, but its production is from a perforation between 17,090 and 17,200 feet. This well is producing from the Middle Miogypsionoides Sand ("Middle Miogyp").[2] The Middle Miogyp is at a depth between 17,100 and 17,250 feet in the area where the Marceaux No. 1 well is drilled. Below the Middle Miogyp, separated by approximately 50 feet of shale, is the Lower Miogyp which lies at a depth between 17,300 and 17,420 feet. Accordingly, although the Marceaux No. 1 well was drilled into the Lower Miogyp, its production is entirely from the Middle Miogyp.

On January 31, 1988 the primary term of the lease expired. Based upon their interpretation of paragraph 17 the lessees tendered to the lessors a release of all horizons located below 17,700 feet. The lessors refused to accept the release, claiming that they were entitled to a release of all horizons 100 feet below the Middle Miogyp, specifically, all horizons below 17,350 feet. Lessees brought the instant declaratory judgment action for a determination of the application of the Pugh clause.

While this action was pending—approximately seven months after the expiration of the primary term of the lease—the lessees completed a producing well in the Lower Miogyp. The pooling unit included some of lessors' property. Although the Louisiana Commissioner of Conservation subsequently revised this unit and removed the lessors' tract, lessors counterclaimed, asking the court to locate the horizontal lease boundary and to determine the sums they were entitled

_____

[2]When the well was drilled the formation was identified by the Louisiana Commissioner of Conservation as one sand having two lobes. As such it was known as the Miogypsionoides Sand. Upon further testing, however, the Commissioner issued orders 745–G and 745–H which divided the one Miogyp Sand into two separately defined zones, designated as the Middle Miogyp Sand and Lower Miogyp Sand.

to from the Lower Miogyp well during the period that their property was included in the pooling unit.

On cross motions for summary judgment the district court granted the lessees' motion holding that "the Lease automatically terminated at the end of its primary term only as to those horizons below the ... depth of 17,709 feet." The court also dismissed with prejudice the lessors' counterclaim for an accounting. Lessors timely appealed.

Analysis

We focus herein on the interpretation of the Pugh clause. Generally, contract interpretation is a question of law reviewed *de novo. Massie v. Inexco Oil Co.,* 798 F.2d 777 (5th Cir.1986); *Austin v. Decker Coal Co.,* 701 F.2d 420 (5th Cir.), *cert. denied,* 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). While "[a]mbiguous contracts may require consideration of evidence beyond the four corners of the contract," neither party to this suit argues that the lease provision is ambiguous, "nor did the district court rely on extrinsic evidence in granting summary judgment to the [lessees] when presented with cross-motions." *Burns v. Louisiana Land & Exploration Co.,* 870 F.2d 1016, 1018 (5th Cir.1989). Therefore, although the parties each assign a different interpretation to the lease provision, we treat it as unambiguous and proceed to construe it *de novo.*

In light of the specific language of paragraph 17, the Louisiana Civil Code articles and jurisprudence governing the interpretation of oil and gas leases, and the purposes of this type of clause, we must disagree with the legal conclusion of the district court and hold that the depth to which the horizontal Pugh clause refers is the depth of the sand from which the Marceaux No. 1 well is producing, not the depth to which the drill stem was extended.

There is no dispute that paragraph 17 of the lease was intended and does operate as a horizontal Pugh clause. The main purpose of any Pugh clause is to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion.

*Rogers v. Westhoma Oil Co.,* 291 F.2d 726 (10th Cir.1961); *Roseberry v. Louisiana Land & Exploration Co.,* 470 So.2d 178 (La.App.1985). The Pugh clause fosters reasonable development of leased property. Horizontal Pugh clauses, like the one at issue, are relatively recent innovations in oil and gas leases, but they serve the same purposes as the more established vertical Pugh clause. In juxtaposition to its vertical counterpart, the horizontal Pugh clause makes a horizontal division of property subject to the lease. As with the original vertical-oriented clause, its purpose is to foster reasonable development of the property burdened by the lease. Stated more simply, if one leases property for oil and gas development, one should develop it during the agreed time or let it go.

While Pugh clauses share the same basic purpose, they may differ in the requirements imposed on the lessee in order to continue the lease beyond its primary term. For example, the lessees herein have attempted to bolster their position by including in the record examples of horizontal Pugh clauses which maintain the lease only to the depth from which there is actual production. These clauses, they argue, indicate that if the lease in question was to be maintained only to those depths from which actual production was being realized, the clause should have been written that way. One need not look very far, however, to find examples of clauses which just as clearly establish that the lessee shall retain lease rights to depths to which the lessee has merely drilled or tested, with no reference to production. *See* Low, *The Law of Oil and Gas,* § 1126 (West 1990 Supp.). In order to determine the depths maintained under the present lease we must look to its specific language.

As an *Erie* court, we defer to Louisiana law for the principles applicable to interpreting the oil and gas lease before us. Under Louisiana law, the codical provisions applicable to ordinary leases are applicable to mineral leases. *Massie,* 798 F.2d at 779; *Bouterie v. Kleinpeter,* 258 La. 605, 247 So.2d 548 (1971). We must therefore "determine the intent of the parties as expressed in the lease without rendering any part of the instrument meaningless." *Massie,* 798 F.2d at 779 (citing Civil Code arts. 2045, 2050). "Some effect is to be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning or effect." *Lambert v. Maryland*

*Cas. Co.,* 418 So.2d 553, 559 (La.1982). "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." Civil Code art. 2048.

Our analysis begins and ends with the text of the lease provision relating to the depth from which the measurement is to be made. The lease identifies that as "the deepest depth drilled (a) from which a well located on the land or acreage pooled therewith is producing in paying quantities...." As used herein, the word "depth" has three modifiers: "deepest," "drilled," and "from which a well ... is producing," We are persuaded that the only depth which meets all three of these criteria is the bottom of the sand from which the Marceaux well is actually producing in the Middle Miogyp.

The district court emphasized the importance of "drilled" but provided no explanation of the effect of the requirement that the depth be one *from which a well is producing.* The bottom of this well at 17,609 feet is simply not a depth *from which a well is producing in paying quantities.* Therefore, this lower depth does not satisfy all of the criteria detailed in the lease.

Lessees argue that the lessors' interpretation of the lease renders meaningless the requirement that the measuring depth be the deepest *drilled* depth. "Meaningless" is an overstatement. More accurately, in our view, is that the drilled depth is "qualified." One must not only drill, under this clause, but one must produce. Taking lessees' argument one step further indicates its Achilles heel. Assume a drilling to a depth of 17,800 feet, with a perforation resulting in a producing well in a 200–foot sand located just below 4500 feet. Is the additional two and one-half miles of depth to be maintained under the lease, without any further development, as long as the sand at 4500 feet surrenders its oil or gas in paying quantities? We are not so persuaded.

As in all cases of contract interpretation, we must seek to ascertain the intent of the parties. Civil Code art. 2045. Requiring that the lessee actually produce minerals from the depth over which

the lease provisions are maintained after expiration of the primary term, is consistent with both the plain and express meaning of the language used and the recognized purpose of the Pugh clause. "The obvious intent of the inserted typewritten clause was to insure that [the lessees] would diligently attempt to explore and develop all of the acreage encompassed within the lease." *Roseberry,* 470 So.2d at 183. To hold otherwise would defeat the main purpose of the horizontal Pugh clause by allowing the lessees to hold deeper horizons indefinitely without producing a cup of oil or an MCF of gas. But for the possibility of an action for breach of further exploration and development, *see Carter v. Arkansas Louisiana Gas Co.,* 213 La. 1028, 36 So.2d 26 (1948), the lessors would be unable to prevent the lessee from holding the Lower Miogyp indefinitely for speculative purposes, and might not ever reap the benefits of their property during their lifetimes. We now hold that the bottom of the horizontal lease is 100 feet below the bottom of the Middle Miogyp, specifically, 100 feet below 17,250 feet within the area drained by the Marceaux No. 1 well.

The final issue before us is the lessors' contention that they are entitled to an accounting of the unit production from the Lower Miogyp Sand. We agree that an accounting is in order; however, there are not sufficient facts in the record to determine the proportionate interests of the parties in the Lower Miogyp Sand production.

Although the lessors urge that the word "horizon" means a flat, parallel boundary line which would be drawn at 17,350 feet, the district court determined that the parties intended it to mean "a body of material or a stratum found below the earth's surface, generally considered to be a bed of sand or other material which contains oil, gas, and other minerals ..." We agree with this definition which we find consistent with the usage of the term in the oil and gas industry. *See* Williams & Meyers, *Manual of Oil & Gas Terms,* 566 (1991) (defining horizon as "a zone of a particular formation ... of sufficient porosity and permeability to form a petroleum reservoir"). Thus, the horizontal lease boundary under the Lounsberry tract is 100 feet below the bottom of the Middle Miogyp, at whatever depth it is found throughout the leased tract.

Although it is not sufficiently established in the summary judgment record, it appears that a portion of the Lower Miogyp may be located above the horizontal lease boundary. Accordingly, on remand the district court is to determine the relative percentage ownership interests of the parties in the Lower Miogyp Sand, if any, and the resulting accounting that is due, if any.

REVERSED and RENDERED, IN PART, and REMANDED for further proceedings consistent herewith.