NUMBER 13-05-178-CV


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







EOG RESOURCES, INC., Appellant,


v.



WAGNER & BROWN, LTD., Appellee.





On appeal from the 105th District Court


of Nueces County, Texas.






O P I N I O N



Before Justices Hinojosa, Yañez, and Castillo


Opinion by Justice Castillo


 This appeal is taken from the trial court judgment in a subsurface boundary
dispute involving oil and gas interests. In competing summary judgment motions,
appellee, Wagner & Brown, Ltd. ("W&B"), and appellant, EOG Resources, Inc.
("EOG"), each sought a declaration of the proper construction of certain language
defining EOG's ownership interests in several oil and gas leases. In two issues, EOG
complains of the trial court's judgment granting W&B's motion and denying EOG's
motion. We affirm. 

I. Background

 W&B is the successor in interest to Longhorn Oil and Gas Company
("Longhorn"). EOG is the successor in interest to REH Energy, Inc. ("REH"). 

 In 1984, Longhorn owned rights in two oil and gas leases, each pertaining to
minerals lying under a 388.6 acre unit near Corpus Christi International Airport. 
Longhorn wanted REH to explore this prospect, and executed a Farmout Agreement
by which REH could earn an assignment of a portion of Longhorn's interests in the
leases. To acquire the rights, REH's obligations included drilling a test well according
to Longhorn's specifications and drilling and completing a producing well (or plugging
and abandoning if a dry hole). The relevant portion of the Farmout Agreement relating
to the transfer of rights provides:

The Assignment provided for above shall be limited in depth to 100 feet
below the deepest producing interval as obtained in the test well, shall
be without warranty either express or implied and shall reserve to
Longhorn all rights below the assigned depths, together with such rights
as are necessary to Longhorn's full enjoyment of the reserved deeper
rights. (Emphasis added)


The Farmout Agreement was designed to establish a horizontal subsurface boundary
below which Longhorn's mineral rights were located, and above which REH's mineral
rights were located. 

 REH drilled a successful test well, complied with all of Longhorn's
specifications, and earned an assignment of the interest in the leases as provided in
the Farmout Agreement. It is undisputed that the test well ("Well #1") produced at
depths between 9,679 feet and 9,729 feet.

 No dispute arose until 2002, subsequent to Longhorn's acquisition by W&B and
REH's acquisition by EOG, when EOG sought to drill a second well. In doing title
research, EOG discovered two unrecorded assignments from Longhorn to REH dated
in 1985, which altered the boundary line set out in the Farmout Agreement. The 1985
assignments conveyed REH's rights to "the vertical interval from the surface to the
depth of 9,779 feet subsurface."

 The parties negotiated to resolve the non-conforming language, which each
agreed needed to be corrected. On September 11, 2002, the parties executed the
Correction of Assignments of Oil and Gas Leases and Recognition of Reversionary
Interests ("Correction Assignment"). In keeping with the original Farmout Agreement,
the Correction Assignment changed the language from the two 1985 assignments
regarding the depth limitation back to "100 feet below the deepest producing interval
as obtained in the test well." The parties, however, dispute the construction of this
phrase. 

 EOG contends that the language "deepest producing interval," as used in the
Farmout Agreement and the Correction Assignment, refers to the formation from
which Well #1 first established production, at whatever depth such interval is found. 
According to EOG, Well #1's deepest producing interval is in the subsurface geologic
formation known as the Morris Sand. In October of 2002, EOG drilled Well #2 (2,800
feet to the north of Well #1) into the Morris Sand, where it began producing. 
However, Well #2 produced at depths between 10,230 feet and 10,266 feet, most
likely because of geological faulting and a structural dip in the Morris Sand formation. 
Since Well #1 produced from an entire underground formation, EOG contends its
interests follow the formation to its deepest part, plus 100 feet. Such a construction
necessarily means that the depth limitation is a variable number. 

 W&B provides additional details. Specifically, on May 7, 2002, W&B received
from EOG a proposed Authorization for Expenditure ("AFE") regarding the drilling of
Well #2. W&B elected to participate in the proposed well, and timely executed and
returned the AFE which implicitly provided that W&B's ownership interest was that
below the depth of 9,779 feet. (1) Only after execution of the AFE did the parties confer
to resolve discrepancies regarding depth of the boundary as set out in the 1985
assignments and the Farmout Agreement. (2) 

 Negotiations culminated in the execution of the Correction Assignment on
September 11, 2002. (3) It adopts language identical to that in the Farmout Agreement,
specifically identifies the test well, and puts numbers on the range of the "producing
interval." Specifically, EOG's interest under the Correction Assignment is defined as:
"All depths from the surface of the ground down to 100 feet below the deepest
producing interval as obtained in the [test Well #1] as seen at a measured depth of
9,679 feet to 9,729 feet subsurface . . . ." 

 EOG forwarded a notice of election to participate in the completion attempt
[Well #2] to W&B on September 30, 2002. (4) W&B timely provided EOG with its intent
to participate to the extent of its full interest, as set out in the earlier-executed AFE. 
However, on October 1, 2002, EOG forwarded to W&B a second notice of election to
participate which reduced W&B's participating interest, allegedly because W&B had
executed the Correction Assignment. W&B's interest, originally recognized as
18.3601389%, was reduced to 3.672069%.

 This dispute ensued. On November 4, 2002, W&B filed suit for a declaratory
judgment of the proper construction of the Farmout Agreement and the Correction
Assignment. W&B also sought attorney fees. The parties filed competing motions for
summary judgment, urging the court to declare their respective interpretations of the
phrase "deepest producing interval as obtained in the test well." On February 11,
2005, the trial court issued its Final Judgment, granting W&B's motion for summary
judgment, denying EOG's motion, and declaring that the Correction Assignment "did
not enlarge or alter the rights owned by the parties and that the interest of EOG
Resources, Inc. under such Correction Assignment is limited to those depths lying
between the surface and a subsurface depth of 9,829 feet in the properties covered
thereby." The Final Judgment identifies W&B's working interest as an undivided
18.3601389% in the leases below a subsurface depth of 9,829 feet, and an undivided
3.672069% interest above that depth. Damages are awarded in the amount
stipulated by the parties. No prejudgment interest is awarded, and the trial court
declined to award attorney fees to any party. This appeal ensued. 

II. Issues on Appeal

 EOG urges on appeal that granting summary judgment in favor of W&B and
denying summary judgment in favor of EOG was in error (issue two) because when the
parties executed the Correction Assignment, they intended the phrase "deepest
producing interval" to refer to an entire formation rather than a particular vertical depth
(issue one). 

 By cross-points, W&B contends the underlying declaration should be affirmed,
but that portion of the judgment declining to award attorney fees should be reversed
and rendered to award W&B fees; alternatively, at the least it should be reversed and
remanded for determination of the amount of a reasonable fee award.

III. Standard of Review

 Suits for declaratory judgment are intended to determine the rights of parties
when a controversy has arisen, before any wrong actually has been committed. 
Montemayor v. City of San Antonio Fire Dep't, 985 S.W.2d 549, 551 (Tex. App.--San
Antonio 1998, pet. denied). We review declaratory judgments under the same
standards as other judgments and decrees. Tex. Civ. Prac. & Rem. Code Ann. §
37.010 (Vernon 1997); Guthery v. Taylor, 112 S.W.3d 715, 720 (Tex.
App.--Houston [14th Dist.] 2003, no pet.); Roberts v. Squyres, 4 S.W.3d 485, 488
(Tex. App.--Beaumont 1999, pet. denied). We look to the procedure used to resolve
the issue at trial to determine the standard of review on appeal. Guthery, 112 S.W.3d
at 720; Roberts, 4 S.W.3d at 488. 

 Here, the trial court determined the declaratory judgment issue through summary
judgment proceedings. The function of summary judgment is to eliminate patently
unmeritorious claims and defenses, not to deprive litigants of the right to a trial by
jury. Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 228 (Tex. 2004)
(citing Casso v. Brand, 776 S.W.2d 551, 556 (Tex. 1989)); Alaniz v. Hoyt, 105
S.W.3d 330, 344 (Tex. App.--Corpus Christi 2003, no pet.). We review de novo a
trial court's grant or denial of a traditional motion for summary judgment. (5) 
Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 816 n.7 (Tex. 2005) (citing Schneider
Nat'l Carriers, Inc. v. Bates, 147 S.W.3d 264, 290 n.137 (Tex. 2004)); Alaniz, 105
S.W.2d at 345. The movant bears the burden of showing that there is no genuine
issue of material fact and that it is entitled to judgment as a matter of law. Tex. R.
Civ. P. 166a(c); Alaniz, 105 S.W.2d at 345; Mowbray v. Avery, 76 S.W.3d 663, 690
(Tex. App.--Corpus Christi 2002, pet. denied). Where, as here, both parties move for
summary judgment and the trial court grants one motion and denies the other, we
review both parties' motions for summary judgment and determine whether the trial
court erred in its decision. Tex. Workers' Comp. Comm'n v. Patient Advocates, 136
S.W.3d 643, 648 (Tex. 2004); Dow Chem. Co. v. Bright, 89 S.W.3d 602, 605 (Tex.
2002); Parker v. Parker, 131 S.W.3d 524, 530 (Tex. App.--Fort Worth 2004, pet.
denied).

IV. Construction of an Agreement

 In construing a written agreement, the primary concern of this Court is to
ascertain the true intent of the parties as expressed in the instrument. Nat'l Union Fire
Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). We
give terms their plain, ordinary, and generally accepted meaning unless the contract
shows the parties used them in a technical or different sense. Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996) (citing Western Reserve Life Ins. Co.
v. Meadows, 261 S.W.2d 554, 557 (Tex. 1953)). If a contract is capable of more
than one reasonable interpretation, it is ambiguous; if, however, the contract can be
given a certain or definite legal meaning or interpretation, then it is not ambiguous and
we will construe it as a matter of law. Coker v. Coker, 650 S.W.2d 391, 393 (Tex.
1983); Cook Composites, Inc. v. Westlake Styrene Corp., 15 S.W.3d 124, 131 (Tex.
App.--Houston [14th Dist.] 2000, pet. dism'd). 

 The parties' interpretation of a contract is parol evidence, and parol evidence is
not admissible to create an ambiguity. Friendswood Dev. Co. v. McDade & Co., 926
S.W.2d 280, 283 (Tex. 1996); Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.,
157 S.W.3d 462, 465 (Tex. App.--Houston [14th Dist.] 2004, no pet.). Only after
an agreement has been determined to be ambiguous can parol evidence be considered
to help ascertain the parties' true intent. McDade, 926 S.W.2d at 283; Hunt, 157
SW.3d at 465; Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc., 56
S.W.3d 313, 319 (Tex. App.--Houston [1st Dist.] 2001, pet. denied). 

 This Court may conclude a contract is ambiguous, even though the parties do
not so contend. Hunt, 157 S.W.3d at 465. When a contract is ambiguous, summary
judgment is improper because the interpretation of the contract becomes a fact issue. 
Id. (citing Coker, 650 S.W.2d at 394; Cook, 15 S.W.3d at 131). In determining
whether a contact is ambiguous, we look to the contract as a whole, in light of the
circumstances present when the contract was executed. Sun Oil Co. (Del.) v.
Madeley, 626 S.W.2d 726, 731 (Tex. 1981); Hunt, 157 S.W.3d at 465; Mescalero,
56 S.W.3d at 319; see Hewlett-Packard Co. v. Benchmark Elecs., Inc., 142 S.W.3d
554, 561 (Tex. App.--Houston [14th Dist.] 2004, pet. denied) ("We construe a
contract from a utilitarian standpoint, bearing in mind the particular business activity
sought to be served."). The contract may be read in light of the surrounding
circumstances to determine whether an ambiguity exists. Sun Oil, 626 S.W.2d at
731-32; Cardwell v. Sicola-Cardwell, 978 S.W.2d 722, 727 (Tex. App.--Austin 1998,
pet. denied). We may "consider the commercial context of the transaction to aid in
our interpretation." Intratex Gas Co. v. Puckett, 886 S.W.2d 274, 278 (Tex. App.--El
Paso 1994, no writ). This commercial context, however, is limited to the "ordinary
terms, customs and usages then in effect" in the industry. See id.; Atwood v.
Rodman, 355 S.W.2d 206, 216 (Tex. Civ. App.--El Paso 1962, writ ref'd n.r.e.). 

[E]ven though a written contract be unambiguous on its face, parol
evidence is admissible for the purpose of applying the contract to the
subject with which it deals . . . . It merely permits proof of the then
existing circumstances, in order to enable the court to apply the language
used therein to the facts as they then existed. It can do no more than
explain the doubtful relations of the instrument consistently with the
relations of the parties, the subject matter of the contract, and the other
incidents thereof. 


Murphy v. Dilworth, 151 S.W.2d 1004, 1005 (Tex. 1941) (citations omitted). 

 Here, both parties urge the contract, and in particular the phrase "deepest
producing interval as obtained in the test well," is unambiguous, although each puts
forth a different construction of the phrase. The trial court, in granting summary
judgment on the declaratory judgment action, implicitly determined there was no
ambiguity. See Hunt, 157 S.W.3d at 465; Coker, 650 S.W.2d at 394. Further, the
trial court did not rely on extrinsic evidence in granting summary judgment to W&B
when presented with cross-motions. We agree there is no ambiguity. 

V. Analysis-Declaratory Judgment

 The test well (Well #1) produced from a depth between 9,679 feet and 9,729
feet subsurface. The original Farmout Agreement conveyed to EOG an interest from
the surface down to "100 feet below the deepest producing interval as obtained in the
test well." The 1985 assignments expressed that interest as to "the vertical interval
from the surface to the depth of 9,779 feet subsurface." When a discrepancy
between these descriptions was found, the parties negotiated the Correction
Assignment, which reinstituted the language as originally set forth in the Farmout
Agreement. W&B contends the Correction Assignment did nothing more than correct
the 50-foot error apparent in the 1985 assignments. EOG contends, by contrast, that
it clarifies that the deepest producing interval is not limited to a vertical depth below
the test well, but rather follows the "producing interval" from which that well
produced, at whatever depth it may be. EOG contends this "producing interval" is the
formation, horizon, field, reservoir or stratigraphic layer otherwise known at the Morris
Sand. Test Well #1 did produce from the Morris Sand, which apparently takes a dip
at some point in the land subject to the leases, thereby explaining the lower depth
from which Well #2 produced. EOG argues that the "deepest producing interval"
attaches to the Morris Sand, rather than to the vertical shaft under Well #1, and
spends extensive time in its brief addressing how the term "deepest producing
interval" is used in the industry. EOG contends that this is a case of first impression
in Texas. We disagree. 

 We apply the plain, ordinary, and generally accepted meaning of the terms in the
contract. See Heritage Res., 939 S.W.2d at 121. We do not look to what the parties
contend was their intent, but rather to that intent as it was expressed in the final
Correction Assignment. Nat'l Union, 907 S.W.2d at 520. Importantly, EOG ignores
the qualifying language "deepest producing interval as obtained in the test well"
(Emphasis added). It matters not how the term "producing interval" without such
qualifying language may be applied. No additional language in the agreement indicates
the parties intended to convey interests according to a variable depth, depending upon
where a "producing interval" might be at any location in the lease. W&B's
interpretation is consistent with the Farmout Agreement and the 1985 assignments,
which form part of the existing circumstances before us. We further note the ready
availability of alternative language or terms which would have clearly expressed any
intent to expand "producing interval as obtained in the test well" to encompass the
depth of the entire Morris Sand formation lying under the leased property. Available
terms include formation, horizon, field, reservoir or stratigraphic layer; the parties did
not elect to use these terms in their agreement. 

 EOG cites various administrative regulations, asserting they define "producing
interval" in a manner consistent with its interpretation. We conclude that, even if we
were to ignore the qualifying language in the Correction Assignment, the regulations
cited (1) do not so define "producing interval," and (2) are, for the most part, directed
to specific geologic conditions not present here. (6) None of the cited regulations support
EOG's argument that "producing interval" as used in the agreement with W&B should
mean the entire formation or stratigraphic layer from which oil is produced. Some
related regulations actually provide further evidence of alternative available terms
which would clearly have made such provision, but which the parties did not use. (7) 

 EOG also relies extensively upon Sandefer Oil & Gas v. Duhon, 961 F.2d 1207
(5th Cir. 1992). Sandefer involved the depth at which a lease would automatically
terminate. Id. at 1208. The clause provided:

After expiration of the primary term, this lease will terminate
automatically as to all horizons situated 100 feet below the deepest
depth drilled (a) from which a well located on the land or acreage pooled
therewith is producing in paying quantities . . . . 


Id. The well was drilled to a depth of 17,609, but produced from a perforation
between 17,090 and 17,200 (the "Middle Miogypsionoides Sand"). Approximately
fifty feet below that formation, separated by a layer of shale, was a formation
identified as the "Lower Miogyp" sand which the well shaft had pierced. Id. at 1209. 
The well produced from the higher formation; the trial court determined that the lease
did not extend to 100 feet below the lower formation, principally because of the
language the parties opted to use in their agreement. See id. We note first the
distinction between the language "as to all horizons," used in Sandefer, and "deepest
producing interval as obtained in the test well," which is in issue here. Further, as the
Sandefer court noted, "[o]ne need not look very far, however, to find examples of
clauses which just as clearly establish that the lessee shall retain lease rights to depths
to which the lessee has merely drilled or tested, with no reference to production." Id.
at 1210. Just as in Sandefer, "our analysis begins and ends with the text of the
[assignment] provision relating to the depth from which the measurement is to be
made." Id. The Correction Assignment used clear language, specifically qualifying and
tying the depth in issue to the test well. (8) We conclude that the trial court did not err
in concluding that the Correction Assignment "did not enlarge or alter the rights owned
by the parties and that the interest of EOG Resources, Inc. under such Correction
Assignment is limited to those depths lying between the surface and a subsurface
depth of 9,829 feet subsurface in the properties covered thereby." The trial court did
not err in granting summary judgment in favor of W&B and in denying EOG's motion
for summary judgment. We overrule EOG's issues on appeal. 

VI. Attorney Fees

 In its petition, W&B sought attorney fees under both section 37.009 of the
Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon
1997), and under section 91.406 of the Texas Natural Resources Code. Tex. Nat.
Res. Code ann. § 91.406 (Vernon 2001). By cross-appeal, W&B urges that the trial
court erred in failing to award it attorney fees pursuant to section 91.406 of the
natural resources code. Id. 

 The parties went forward on their motions for summary judgment as to the
declaratory judgment action only. W&B's motion for summary judgment is expressly
limited to seeking a "declaratory judgment declaring the respective ownership
interests" of EOG and W&B. A Stipulation and Agreement executed by the parties
sets forth the amount of actual damages to be paid in the event W&B prevails, and
provides for submission of both EOG's and W&B's claims for attorney fees by motion
and affidavit, rather than by live testimony. Although the Final Judgment tendered to
the court included provisions for those fees, none were awarded. 

 A party may recover attorney fees only if provided by statute or by contract.
Gulf State Util. Co. v. Low, 79 S.W.3d 561, 567 (Tex. 2002) (citing Dallas Cent.
Appraisal Dist. v. Seven Inv. Co., 835 S.W.2d 75, 77 (Tex. 1992)). Whether attorney
fees are available under a particular statute is a question of law, which we review de
novo. Jakab v. Gran Villa Townhouses Homeowners Ass'n, Inc., 149 S.W.3d 863,
867 (Tex. App.--Dallas 2004, no pet.). In a declaratory judgment proceeding,
"reasonable and necessary attorneys' fees" may be awarded as are "equitable and
just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 1997) (emphasis added);
Allstate Ins. Co. v. Hallman, 159 S.W.3d 640, 643 (Tex. 2005). However, a judge's
decision to award or not award attorney's fees under this statute is reviewed on
appeal for an abuse of discretion. Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W. 3d
143, 163 (Tex. 2004). Moreover, W&B does not contend it is entitled to attorney
fees under the declaratory judgments act. Because the parties went forward solely on the declaratory judgment action,
fees that may or may not be available under section 91.406 of the natural resources
code are not in issue. The petition clearly sets out the claim for declaratory judgment
with an attendant claim for attorney fees, and, as a separate and alternative cause of
action, a claim under chapter 91 of the natural resources code for payment of
proceeds. Tex. Nat. Res. Code Ann. § 19.401 et seq. (Vernon 2001). That cause of
action and its accompanying claim for attorney fees were not before the trial court at
the time the motions for summary judgment were ruled upon. The trial court ruled on
the motions for summary judgment on December 16, 2003. Subsequently, on January
31, 2005, the parties entered into their Stipulation and Agreement so that a final
judgment might be secured. The Final Judgment, incorporating the stipulated
damages, was entered on February 11, 2005.

 W&B's cross-issues on appeal are directed solely to its entitlement to attorney
fees under a statutory claim that was not before the trial court. The trial court did not
err in failing to award fees on the basis of that claim. W&B's cross-issues are
overruled.


VII. Conclusion

 Having overruled EOG's issues on appeal and W&B's cross-issues on appeal, we
affirm the judgment of the trial court in all respects. 

 ERRLINDA CASTILLO

 Justice


Opinion delivered and filed 

this 10th day of August, 2006.

 

 
1. The AFE specifically provides that W&B's percentage working interest is 18.3601389%, rather
than a reduced 3.672069%. 
2. There was some dispute as to when each of the parties first learned of the 1985 assignments. 
3. During these negotiations, each party tendered alternative proposals, each of which was
rejected by the other. 
4. Well #2 was completed on October 25, 2002, to a depth of between 10,230 and 10,266 feet
subsurface.
5. W&B's petition includes additional alternative claims for fraudulent inducement, unjust
enrichment, conversion, money had and received, and payment of proceeds pursuant to chapter 91 of
the natural resources code. Tex. Nat. Res. Code Ann. § 91.401 et seq. (Vernon 2001). W&B filed a
traditional motion for summary judgment on its declaratory judgment claim. EOG filed a counter motion
for summary judgment on that same claim. EOG's motion also included a no-evidence motion as to
W&B's other alternative claims. However, at the hearing, EOG made it clear that it would not address
those claims, and that it was not going forward on its no-evidence summary judgment motion:


[T]he parties have agreed not to hear any of that because the Court's ruling on the legal
issue will be dispositive . . ., depending on how the Court rules, of course . . . so we
have agreed . . . that today we are only hearing and responding to the legal question of
what do these contracts mean.
6. Section 3.41 of title 16 of the Texas Administrative Code provides that field designations shall
include "the producing intervals of all pertinent oil and gas wells," and for a discovery well, should
identify "the names of the producing formations, and approximate average depth of the producing
interval." 16 Tex. Admin. Code §3.41(a) (2006). Section 3.101(directed to certifications for severance
tax exemptions) provides that such applications should include, for wells producing coal seam gas, a log
including a "detailed lithologic description of the gas-producing interval," and, for wells producing
Devonian shale gas, information calculating the percentage of footage of the producing interval which
is not Devonian shale and "reference to a standard stratigraphic chart of text establishing that the
producing interval is a shale of Devonian age." 16 Tex. Admin. Code § 3.101(e) (2006). Section 3.86
applies to horizontal drainhole wells, and defines a "correlative interval" as the designated depth interval
for the field or "the producing interval for the field in which the horizontal drainhole is completed." 16
Tex. Admin. Code § 3.86(a) (2006). EOG concedes in its brief that law pertaining to horizontal wells
is not applicable in this case. 
7. Section 3.13 (dealing with casing, cementing, drilling and completion requirements for a well)
defines "productive horizon" as "any stratum known to contain oil, gas or geothermal resources in
commercial quantities in the area." 16 Tex. Admin. Code § 3.13(a)2)(D) (2006).
8. We further note that Longhorn and REH executed an original Joint Operating Agreement
("JOA") on January 18, 1984; the Farmout Agreement was executed on January 31, 1984. The parties
provided in the JOA, in the context of abandonment of wells that have produced, that interests
transferred to a non-abandoning party would be limited to the "interval or intervals of the formation or
formations then open to production." Clearly, the parties knew such language was available and
understood its meaning, but opted to use narrower language in the Farmout Agreement. It is that same
language that was carried forward into the Correction Assignment.