**Opinion filed February 12, 2015**



## In The

# Eleventh Court of Appeals

_____

## No. 11-12-00064-CV

_____

## DAVID ALBERT D/B/A DAVID ALBERT OIL & GAS AND ABX OIL & GAS, INC., Appellants
## V.
## DUNLAP EXPLORATION, INC., Appellee

### On Appeal from the 29th District Court
### Palo Pinto County, Texas
### Trial Court Cause No. C43601

### O P I N I O N

This appeal concerns the applicability of a horizontal "Pugh" clause. *See Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207 (5th Cir. 1992) (discussing the origin and purpose of a Pugh clause, including a horizontal Pugh clause). The trial court determined as a matter of law that the horizontal Pugh clause did not apply to the gas wells that are the subject of this appeal. We affirm.

*Background Facts*

Evelyn Petty Ferguson, individually and as independent executrix of the Estate of Bettie Petty, and Durwood Petty, individually and as trustee of the Bettie Petty Mineral Estate Trust, leased a 251.5-acre tract to United Energy Partners,

Incorporated (United) on June 16, 1995, for the purpose of oil and gas development. The parties refer to this lease as the "251.5 acre lease." The 251.5-acre lease contains a Pugh clause that provides as follows:

> 22. This lease shall expire at the end of the primary term hereof or any extension thereof by reason of operations being conducted at the end of the primary term hereof as to all land outside any pooled and/or proration unit assigned to any well theretofore completed as a well capable of producing oil and/or gas *and also shall expire as to all depths below the deepest depth drilled theretofore established in a well located on lands covered by this lease.*

(Emphasis added). The above-quoted paragraph was included among other typed provisions that appear to have been added to a preprinted oil and gas lease form. The italicized portion of the above-quoted paragraph sets out the horizontal Pugh clause that is at issue in this appeal.

Evelyn Petty Ferguson, individually and as independent executrix of the Estate of Bettie Petty, subsequently executed another oil and gas lease on June 7, 1996, in favor of United on a neighboring 70.5-acre tract. The parties refer to this lease as the "70.5 acre lease." The 70.5-acre lease does not contain a horizontal Pugh clause.

The 251.5-acre lease and the 70.5-acre lease each provided for a primary term of two years. In light of the existence of the horizontal Pugh clause in the earlier 251.5-acre lease, we focus our attention on the events that occurred during its two-year primary term. United drilled and completed two gas wells on the 251.5-acre lease prior to the end of its primary term, the BPE No. 1 well and the BPE No. 2 well.[1] As set forth in greater detail below, the BPE No. 2 well was the deeper of the two wells.

---

[1]United also drilled the BPE No. 3 well during the primary term of the 251.5-acre lease. However, the parties have not placed any significance on the existence of this well in their analysis of this appeal. In this regard, the record indicates that the BPE No. 3 well is located on the 70.5-acre lease and that its producing interval is between 2,965 and 2,980 feet.

The lessors and United also executed a "Declaration of Pooled Unit" during the primary term of the 251.5-acre lease wherein the 251.5-acre lease and the 70.5-acre lease were pooled into a single production unit. This pooling agreement pooled the production from all gas wells "produced under and by virtue of said leases, from the lands covered by said leases, and as to all depths covered by said leases." The pooling agreement provided that it was "effective as of first production from the pooled unit lands." Additionally, the pooling agreement acknowledged that Durwood Petty, in his capacity as the trustee of the Bettie Petty Mineral Estate Trust, was not a lessor under the 70.5-acre lease. The pooling agreement addressed this issue by providing that Durwood Petty adopted, ratified, and confirmed the 70.5-acre lease by his execution of the pooling agreement. The pooling agreement further provided that the lessors consented to the formation of the pooled unit by their execution of the pooling agreement.

Appellants, David Albert d/b/a David Albert Oil & Gas and ABX Oil & Gas, Inc., subsequently obtained United's interest in the leases and pooled unit. In this regard, Durwood Petty, both individually and in his capacity as trustee of the Bettie Petty Mineral Estate Trust, executed a "Ratification, Renewal and Extension of Oil, Gas and Mineral Lease" in February 2001 wherein he acknowledged that David Albert Oil & Gas and others[2] were the successor lessees under the leases.[3]

In August 2003, Albert and ABX's predecessor entered into a farmout agreement with Appellee, Dunlap Exploration, Inc., to develop the 322-acre pooled

---

[2]The other successor lessees named in the ratification agreement were Albert-Bishop Exploration Co., Inc. and B.E.A.R. Exploration Company. Albert-Bishop Exploration Co., Inc. subsequently changed its name to ABX Oil & Gas, Inc. B.E.A.R. Exploration Company is not a party to this appeal. The briefs and other documents in this appeal refer to Albert and ABX Oil & Gas, Inc. collectively for all intents and purposes.

[3]It would appear that the Bettie Petty Mineral Estate Trust had obtained the interests of the Estate of Bettie Petty at the time that the ratification agreement was executed because the Bettie Petty Mineral Estate Trust was the only lessor executing the ratification agreement and a subsequent lease for the acreage covered by the 251.5-acre lease.

unit. Pursuant to the farmout agreement, Dunlap drilled and completed four wells in the pooled unit: the BPE Nos. 4, 4A, 5, and 7 wells. Albert assigned 160 acres from the 322-acre pooled unit to Dunlap for these four wells while retaining the remaining 162 acres.

ABX subsequently conducted drilling operations on the acreage it retained in the pooled unit. In August 2007, ABX submitted an application for a drilling permit to the Railroad Commission of Texas to drill the BPE No. 6 well to a depth of 6,000 feet. The Commission issued the permit in September 2007. ABX drilled the BPE No. 6 well to a total depth of 4,502 feet, completing it in November 2007 at a "producing interval" of between 4,172 feet and 4,176 feet. ABX submitted an application in January 2008 for a drilling permit to drill the BPE No. 1D well to a depth of 6,000 feet. The Commission issued the permit for the BPE No. 1D well in March 2008. ABX drilled the BPE No. 1D well to a total depth of 4,778 feet, completing it in March 2008 at a producing interval of between 4,164 feet and 4,167 feet.

Dunlap alleged that the BPE Nos. 6 and 1D wells were drilled in violation of applicable Commission regulations because of their proximity to acreage assigned to Dunlap under the farmout agreements. With regard to the BPE No. 1D well, Dunlap alleged that it was drilled on acreage assigned to Dunlap under the farmouts. Dunlap subsequently filed suit against Albert and ABX in April 2008 (the prior lawsuit). The parties resolved the prior lawsuit by entering into a written settlement agreement that was incorporated into an agreed final judgment entered by the trial court on December 9, 2009. Under the terms of the settlement agreement, "ABX/Albert"[4] agreed to pay Dunlap a cash settlement of $300,000. ABX/Albert also confirmed and ratified that they assigned 100% of their leasehold

---

[4]The settlement agreement "collectively" referred to Appellants as "ABX/Albert."

rights to Dunlap in the previously executed assignments for the BPE Nos. 4, 4A, 5, and 7 wells.

The provisions of the settlement agreement dealing with the BPE Nos. 1D and 6 wells are relevant to this appeal. The parties agreed that Dunlap "is vested with or retains an undivided working interest equal to 40% to the 8/8ths working interest and 32% to the 8/8ths net revenue interest in the BPE No. 1D wellbore only, effective November 1, 2009." Dunlap executed a "Partial Assignment of Right to Wellbore Production" in favor of ABX, which was attached as an exhibit to the settlement agreement, wherein Dunlap assigned its leasehold rights to production from the BPE No. 1D well in excess of a 40% working interest and a 32% net revenue interest.

The parties also agreed that Dunlap "is vested with and assigned an undivided working interest equal to 40% to the 8/8ths working interest and a 32% to the 8/8ths net revenue interest in the BPE No. 6 wellbore only, effective November 1, 2009." ABX and Albert executed a "Partial Assignment of Right to Wellbore Production" with respect to the BPE No. 6 well, which was attached as an exhibit to the settlement agreement, wherein ABX and Albert assigned "a 40% working interest to the 8/8ths and 32% net revenue interest to the 8/8ths in the right to production from the BPE No. 6 wellbore."

Other than concluding the prior lawsuit, the settlement agreement executed in November/December 2009 did not end the parties' dispute concerning the BPE Nos. 1D and 6 wells. Albert and ABX did not pay Dunlap production payments for the two wells in November and December 2009 despite the terms of the settlement agreement requiring payment to Dunlap. Albert and ABX asserted that Dunlap was not entitled to a share of the production from the two wells because of the horizontal Pugh clause in the 251.5-acre lease. Albert and ABX contend that the "deepest depth drilled" during the primary term of the 251.5-acre lease was the

"true vertical depth" of the BPE No. 2 well of 4,135 feet and that the BPE Nos. 1D and 6 wells are deeper than this depth because their producing intervals are 4,164 to 4,167 feet (the BPE No. 1D well) and 4,172 to 4,176 feet (the BPE No. 6 well). Thus, Albert and ABX are asserting that they did not have rights to drill to these depths when they drilled the BPE Nos. 1D and 6 wells. Albert and ABX subsequently obtained another lease, effective December 15, 2009, from Durwood Petty, as trustee of the Bettie Petty Mineral Estate Trust, that included these "deep rights." The Bettie Petty Mineral Estate Trust also informed Dunlap that it conveyed "all claims, damages, causes of action, rights to non-paid royalty, damages to welbores [sic], damages for trespass, and all similar claims" to Albert.

Dunlap filed the underlying lawsuit on March 29, 2010, against Albert and ABX seeking to enforce the agreed judgment and settlement agreement entered in the prior lawsuit. Dunlap sought and obtained two summary judgments that resulted in the trial court entering final judgment in its favor. The trial court determined that the original 251.5-acre lease remained in effect and that it no longer contained a depth limitation as a result of the pooling agreement and ratification agreement. Based on this determination, the trial court confirmed the validity of the farmout assignments to Dunlap for the BPE Nos. 4, 4A, 5, and 7 wells. The trial court also confirmed the validity of the assignments executed in connection with the BPE Nos. 1D and 6 wells as a part of the settlement agreement. The trial court determined that the subsequent lease executed by the Bettie Petty Mineral Estate Trust on December 15, 2009, was invalid. The trial court also awarded Dunlap damages of $146,101.38, ordered Albert and ABX to prospectively pay Dunlap its proportionate share of production from the BPE Nos. 1D and 6 wells, and awarded Dunlap attorney's fees.

*Issues*

Albert and ABX assert ten issues on appeal. Their first eight issues challenge the trial court's entry of judgment in favor of Dunlap, while their ninth and tenth issues are contingent upon a reversal of the trial court's judgment.[5] In their first issue, Albert and ABX globally challenge the summary judgments and final judgment. They assert in their second and sixth issues that the trial court erred in concluding that Dunlap owned the deep well rights that are the subject of this lawsuit. Albert and ABX's third, fourth, and fifth issues challenge various bases relied upon by Dunlap in support of the trial court's determination that Dunlap owned the deep well rights. Their seventh and eighth issues challenge the trial court's determination that they breached the settlement agreement and committed conversion by withholding the proceeds of production from the BPE Nos. 1D and 6 wells after the execution of the settlement agreement.

*Analysis*

Dunlap initially moved for a partial summary judgment on traditional grounds. After the trial court granted the partial summary judgment, Dunlap filed a second motion for summary judgment on both traditional and no-evidence grounds. We find Dunlap's traditional grounds for summary judgment dispositive of this appeal. Accordingly, we do not reach Dunlap's no-evidence grounds for summary judgment.

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant for traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In reviewing a

---

[5]In the event of a reversal, the ninth issue seeks a remand of the award of attorney's fees and the tenth issue seeks a remand of the damages award.

summary judgment, we must consider all of the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the movant. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007). We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence presented, and we may not ignore undisputed summary judgment evidence that cannot be disregarded. *Id.* at 755, 757.

The resolution of this appeal hinges upon the trial court's determination that Dunlap owned the deep well rights as a matter of law. As used herein, the term "deep well rights" means the authority under either the 251.5-acre lease, the pooling agreement, or the ratification agreement to develop minerals deeper than the depth of the BPE No. 2 well, the deepest well drilled on the 251.5-acre lease during its primary term.

### *The 251.5-Acre Lease*

An oil and gas lease is a contract, and its terms are interpreted as such. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). The interpretation of an unambiguous lease is a question of law for the court, subject to de novo review. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). The horizontal Pugh clause in the 251.5-acre lease provided that the lease would expire "as to all depths below the deepest depth drilled" during the primary term of the lease.

The parties have offered differing analyses regarding the deepest depth drilled of the BPE No. 2 well. As noted previously, Albert and ABX contend that the deepest depth drilled during the primary term of the 251.5-acre lease was the "true vertical depth" of the BPE No. 2 well of 4,135 feet. True vertical depth is the measurement from the surface to the bottom of the wellbore in a straight,

perpendicular line. Dunlap contends that the deepest depth drilled for the BPE No. 2 well is its "measured depth" of 4,261 feet. Measured depth is the actual length of the wellbore, i.e., the length of the pipe in the wellbore. The practical difference between these two depths for the BPE No. 2 well is that the producing intervals for the BPE No. 1D well (4,164 to 4,167 feet) and the BPE No. 6 well (4,172 to 4,176 feet) lie between 4,135 feet and 4,261 feet.

The parties have cited various law review articles and industry resources to assert that the 251.5-acre lease's use of "deepest depth drilled" means either true vertical depth or measured depth. In this regard, Dunlap contends that measured depth is the "preferred industry standard." As set forth below, we conclude that the pooling agreement and the ratification agreement eliminated the applicability of the horizontal Pugh clause in the 251.5-acre lease. Accordingly, it is not necessary for us to interpret the term "deepest depth drilled" as used in the lease.

*The Pooling Agreement*

In their third issue, Albert and ABX challenge the trial court's determination that the pooling agreement served to hold all acreage and all depths. The pooling of an oil and gas lease is a matter of contract, and the terms of a pooling agreement are interpreted according to general contract law. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008); *Tittizer*, 171 S.W.3d at 860. In construing a contract, our primary objective is to ascertain and give effect to the true intentions of the parties as expressed in the contract. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). In identifying such intent, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that no provision will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the written agreement is so worded that it can be assigned a certain

or definite legal meaning or interpretation, it is not ambiguous, and a court will construe the agreement as a matter of law. *Id.*

"The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999); *see Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952). When mineral interests are properly pooled, all interest holders in the pool are entitled to their proportionate share of the pool's production, regardless of where the well is drilled. *Samson Lone Star, Ltd. P'ship v. Hooks*, 389 S.W.3d 409, 431 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (op. on reh'g).

The pooling agreement provided as follows:

DECLARATION OF POOLED UNIT
FOR THE UNITED ENERGY PARTNERS, INCORPORATED-
PETTY ESTATE GAS UNIT, AND
RATIFICATION OF LEASE

STATE OF TEXAS § 
                    §     KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF PALO PINTO §

THAT United Energy Partners, Incorporated, whose address is 100 North Central Expressway, Suite 1250, Dallas, Texas, 75201, hereinafter referred to as "Lessee", is the present record owner and holder of the oil, gas and mineral leases described in Exhibit "A" attached hereto, and pursuant to the terms and provisions of each of said leases granting unto lessees, their successors and assigns, the right, power and option to pool, unitize or combine the lands covered by the leases, or any portion thereof, with other lands and leases, does hereby execute this instrument as a formal declaration that there is hereby pooled, unitized and combined into one gas and gaseous substances pooled unit area, the gas, distillate, condensate, gaseous substances, and all other liquid hydrocarbons produced from wells classified as gas wells with the Texas Railroad Commission, produced under and by virtue of said leases, from the lands covered by said leases, and as to all depths covered by said leases.

The pooled unit created hereunder shall be known as the "United Energy Partners, Incorporated-Petty Estate Gas Unit," and is comprised of all lands covered by those leases described in Exhibit "A" attached to and made a part hereof.

This pooling and unitization shall continue so long as (i) there is situated on the unit hereby created a well capable of producing the pooled substances in paying quantities; or (ii) production, drilling or reworking operations are being conducted upon the pooled unit area in compliance with the time periods provided for as set forth in said leases.

Lease 1 [the 251.5-acre lease,] described on Exhibit "A" attached hereto, contains a provision that the lands covered by such lease shall not be pooled without the written consent of Lessor. Such consent has heretofore been obtained, and in order to confirm such pooling consent, the undersigned Lessors hereby expressly consent to the formation of the pooled unit herein described, and do hereby adopt, ratify and confirm the same.

Lease 2 [the 70.5-acre lease,] described on Exhibit "A" attached hereto was executed solely by Evelyn Petty Ferguson, as Independent Executrix of the Estate of Bettie Petty, deceased, which is currently in administration in the County Court of Palo Pinto County, and Durwood Petty, the designated Trustee for the Bettie Petty Mineral Estate Trust established under the Will of Bettie Petty, does hereby adopt, ratify and confirm said lease, and does hereby grant, lease and let the lands covered by said lease in favor of United Energy Partners Incorporated, subject to all of the terms, provisions, and conditions set forth in said lease.

This instrument may be executed in one or more counterparts each of which shall be binding upon the parties executing same, regardless of whether or not this instrument or a counterpart is executed by any other party named herein. The signature and acknowledgment pages of the several counterparts may be combined with the body of one counterpart for recording purposes.

Executed as of the acknowledgement date of the undersigned, but effective as of first production from the pooled unit lands.

The operative provision of the pooling agreement is the first paragraph wherein it provides for pooling from "the lands covered by said leases, and *as to all depths covered by said leases*" (emphasis added). Dunlap contends that the pooling agreement modifies the depth limitation in the 251.5-acre lease because it provides that production from the pooled unit holds the lands covered by the leases as to all depths covered by said leases.

United and the lessees executed the pooling agreement during the primary term of the 251.5-acre lease when all depths continued to be covered by the lease. Furthermore, the parties made the pooling agreement effective from the date "of first production from the pooled unit lands." Accordingly, we agree with Dunlap that the depth limitations of the horizontal Pugh clause were never triggered because first production from the unit occurred before the primary term of the 251.5-acre lease ended. In this regard, the lessors agreed to the terms of the pooling agreement and its resulting modification of the 251.5-acre lease by their execution of the pooling agreement. Furthermore, there is no suggestion that production in paying quantities has ceased since then.

Albert and ABX contend that "[n]othing contained in the Pooling Agreement changed, altered, modified, or addressed any exemption of the Horizontal Pugh Clause in the 251.5 acre lease." As we stated in the previous paragraph, we disagree with their contention. They further contend that the pooling agreement contains language making its provisions "subject to all of the terms, provisions, and conditions set forth in said *leases*" (emphasis added).[6] This is a misreading of the pooling agreement. The "subject to" language is contained in the provision of the pooling agreement that addresses Durwood Petty's ratification of the 70.5-acre lease. Rather than making the provisions of the pooling agreement subject to the terms of the leases, the "subject to" language only

---

[6]See next footnote.

means that Durwood Petty was ratifying the 70.5-acre lease in favor of United "subject to all of the terms, provisions, and conditions set forth in said *lease*" (emphasis added).[7] Accordingly, we overrule Albert and ABX's third issue.

*The Ratification Agreement*

In their fourth issue, Albert and ABX challenge the trial court's determination that the ratification agreement also modified the horizontal Pugh clause. They contend that the ratification agreement neither extended nor modified the 251.5-acre lease. Albert and ABX base this contention on a provision of the ratification agreement providing that Durwood Petty did "adopt, ratify and confirm said lease . . . under the same terms, provisions and covenants contained and set forth in said lease(s)." However, the ratification agreement also contained an Exhibit "A" that provides in relevant part as follows:

> Notwithstanding anything to the contrary, the following paragraphs shall become an additional part of the provisions that were earlier set forth in the [the 251.5-acre lease and the 70.5-acre lease]. And so far as these subsequent paragraphs are in conflict set forth [sic] in the previous lease(s) they shall control and supersede anything so stated to the contrary in the earlier lease(s):

> 1.)     For each of the existing wellbores and any other wells that may be drilled on the Bettie Petty Estate Lease, the following number of acres shall be allowed for a proration unit to be set aside per wellbore based on depth control and the proper reservoir drainage that needs to be applied in the protection for the following zones and at the following depths:

| Formation | Approximate Depth Range | Acreage allowed to be assigned for Proration Unit(s) | |
| --- | --- | --- | --- |
| | | for Gas Prod | for Oil Prod |
| Strawn | Surface - 1000' | 20 acres | 2 acres |
| Strawn | 1000' - 2000' | 40 acres | 2 acres |

---

[7]We have italicized the term "lease" to note that, contrary to Albert and ABX's representation, the "subject to" language ends with the word "lease" rather than the word "leases."

| | | | |
|---|---|---|---|
| Strawn | 2000' - 3000' | 80 acres | 10 acres |
| Pregnant Shale (exceptional) | 3000' - 4000' | 40 acres | 20 acres |
| Big Saline/Bend Conglomerates | 4000' - 4750' | 160 acres | 20 acres |
| Marble Falls Lime (exceptn'l) | 4750' - 5000' | 80 acres | 20 acres |
| Barnett Shale (exceptional) | 5000' - 5500' | 20-40 acres | 20-40 acres |
| Ellenburger | ±/> 5500' | 80-160 acres | 40 acres |

The terms of Exhibit "A" expressly supersede any conflicting terms in the two leases. Its reference to the drilling of wells in excess of 5,500 feet negates the horizontal Pugh clause contained in the 251.5-acre lease "[f]or each of the existing wellbores and any other wells that may be drilled" on the leases in the future. In this regard, the provisions of Exhibit "A" do not contain a time restriction. Accordingly, we conclude that the trial court did not err by determining that the ratification agreement also negated the horizontal Pugh clause. We overrule Albert and ABX's fourth issue.

*Estoppel*

In their fifth issue, Albert and ABX challenge the trial court's determination that they are estopped from making inconsistent claims with reference to the reason for not paying Dunlap its share of production from the BPE Nos. 1D and 6 wells after the execution of the settlement agreement. The trial court cited *Cambridge Production, Inc. v. Geodyne Nominee Corp.*, 292 S.W.3d 725 (Tex. App.—Amarillo 2009, pet. denied), in support of this proposition. The court held in *Cambridge Production* that a top lessee was estopped from asserting that a pooled unit had terminated because the underlying lessors who executed the top lease had accepted royalties from the unit. 292 S.W.3d at 732. The court based its decision on the doctrine of quasi estoppel. This doctrine precludes a party from

14

accepting the benefits of a transaction and then taking a subsequent inconsistent position to avoid corresponding obligations or effects. *Id.* The doctrine of quasi estoppel applies when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which he acquiesced or from which he accepted a benefit. *Id.*

Albert and ABX assert that they did not take an inconsistent position because the settlement agreement contains the following recital:

> 13. **Deep Rights.** In regard to the lands associated with the 251.5 acre Lease, ABX/Albert represents that they do not own a leasehold interest in the oil, gas and other minerals below the depth of the deepest well drilled on the Leased Premises during the primary term of the 251.5 acre Lease.

We disagree with Albert and ABX's contention that this recital absolves them from the application of the doctrine of quasi estoppel. The old adage that *actions speak louder than words* seems particularly applicable to the facts in this case. Albert and ABX drilled the BPE Nos. 1D and 6 wells, presumably in reliance on the terms of the pooling agreement and the ratification agreement. In doing so, they represented that they had authority to drill the wells when they sought permission from the Commission to drill them. Afterward, they received production proceeds from the wells. They then conveyed, and retained interests in, the two wells to Dunlap by executing the settlement agreement and its supporting documentation. Furthermore, the lessees presumably received royalties from the BPE Nos. 1D and 6 wells after they were drilled. Accordingly, the trial court correctly determined as a matter of law that Albert and ABX were estopped from repudiating their authority to drill the BPE Nos. 1D and 6 wells under the terms of the pooling agreement and the ratification agreement. We overrule Albert and ABX's fifth issue.

*Conclusion*

Our action in overruling Albert and ABX's third, fourth, and fifth issues is dispositive of the remaining issues in this appeal. As set forth above, the trial court did not err in determining that Dunlap owned the deep well rights. Accordingly, we overrule Albert and ABX's second and sixth issues challenging this determination. We also overrule their first issue challenging the trial court's orders granting summary judgment and final judgment in favor of Dunlap on the deep-well-rights issue. We also overrule Albert and ABX's seventh and eighth issues as they are also controlled by the determination that Dunlap owned the deep well rights. We need not reach Albert and ABX's ninth and tenth issues because they are contingent upon our reversal of the trial court's judgment.

*This Court's Ruling*

We affirm the orders and judgment of the trial court.

JOHN M. BAILEY

JUSTICE

February 12, 2015

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.