COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  | § |  |
|---|---|---|
| COMMUNITY BANK OF RAYMORE, AS TRUSTEE OR AGENT, | § | No. 08-12-00025-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd Judicial District Court |
|  | § | of Loving County, Texas |
| CHESAPEAKE EXPLORATION, L.L.C, AND ANADARKO PETROLEUM CORPORATION, | § | (TC#10-08-783) |
|  | § |  |
| Appellees. |  |  |

## **O P I N I O N**

This appeal concerns the construction of an oil and gas lease. The issue is whether the right to extract minerals found deeper than the stratum or level from which production had been secured in a particular unit terminated when the lease's primary term expired. The trial court concluded that it did not and rendered a take-nothing judgment in favor of Chesapeake Exploration, L.L.C. and Anadarko Petroleum Corp. and against Community Bank of Raymore ("CBR").[1] In two issues, CBR argues that the trial court erred in so ruling. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 26, 2005, the parties entered into an oil and gas lease covering approximately

---

[1] We refer to Appellees collectively as Chesapeake, for we see nothing in the issues that requires us to distinguish between Chesapeake and Anadarko.

16,000 acres of land in Loving County, Texas, divided into four separately-identified Blocks.[2] During the lease's primary term, Chesapeake drilled and completed thirteen producing wells on Block Two. When the lease's primary term expired on January 26, 2010, the base of the deepest-producing formation in Block Two was located 5,672 feet below the surface. After the primary term expired, CBR requested that Chesapeake release the mineral rights to all formations in Block Two found at depths greater than 5,672 feet below the surface. When Chesapeake refused to tender a release, CBR sued for declaratory judgment and breach of contract.

At trial, CBR advanced two arguments in support of its contention that Chesapeake no longer had the right to extract minerals from the undeveloped, deep-lying formations in Block Two. CBR argued primarily that under the express terms of the lease's horizontal "Pugh clause,"[3] the mineral rights to these formations terminated because there was no production in paying quantities from these formations when the lease's primary term expired. The lease's Pugh clause reads in part:

> **G. Horizontal Termination:** At the expiration of the Primary Term or the conclusion of the continuous development program, this Lease shall terminate as to all of the leased Oil and Gas rights in all formations below the depth of 100 feet below the stratigraphic equivalent of the base of the deepest formation from which the Lessee is then producing Oil and/or Gas in paying quantities from a well or wells located on such proration or producing unit.

Chesapeake disagreed with CBR's argument, countering that the Pugh clause never sprang into life because Chesapeake had maintained the lease beyond the primary term by securing production in paying quantities from the existing wells on Block Two and by developing Block Two in accordance with the lease's continuous-development clause. That clause provides:

---

[2] The issues in this appeal, however, relate only to Block Two.

[3] The clause is named after its creator, Lawrence G. Pugh, Sr. *See Fremaux v. Buie*, 212 So.2d 148, 149 n.1 (La.App. 1968).

2

**F. Continuous Development of Undeveloped Acreage:** This Lease shall terminate as to the undeveloped Leased Land at the expiration of the Primary Term of this Lease unless Lessee commences a continuous development program on the undeveloped Leased Land in accordance with the terms and provisions hereinafter set forth:

(1) If at the expiration of the Primary Term, a producing well or well capable of producing is located on the Leased Land or if Lessee is engaged in the actual drilling of a well in search of Oil and/or Gas and thereafter diligently prosecute drilling of such well . . . then Lessee shall thereafter have the option to continuously develop the undeveloped acreage with no cessation of more than one hundred eighty (180) days from the date of the release of the drilling rig from one well until the commencement of actual drilling on the next successive well with the first development well being due within one hundred eighty (180) days from the later of the above to have occurred. Should Lessee not opt to continuously develop the undeveloped acreage as provided for herein above, this Lease shall terminate as to the all undeveloped acreage at such time as Lessee fails [sic] continuously develop as so provided herein.

CBR argued alternatively that if the Pugh clause was never triggered, the rights to the undeveloped, deep-lying formations in Block Two terminated nevertheless because the continuous development program required the development of land situated in a "proration unit" and Chesapeake was not developing land so situated. In making this argument, CBR relied on the lease's producing-acreage clause:

**D. Producing Acreage:** If this lease is still in full force and effect at the end of the Primary Term because Oil and/or Gas is being produced or capable of being produced at such time in paying quantities from the Leased Land under the terms of this Lease, or because the Lessee is actually drilling an Oil and/or Gas well at the end of the Primary Term, this Lease shall nevertheless terminate as to all land not included within the boundary lines of a proration unit or producing unit designated for a producing Oil well or a producing Gas well or that is not included within the boundary lines of a proration unit on which Lessee is then drilling a well in search of Oil and/or Gas, unless the Lessee continues to develop the Leased Land in accordance with the continuous development provision herein set forth.

Chesapeake countered, asserting that its continued development of Block Two was sufficient to maintain the undeveloped, deep-lying formations beyond the primary term

and satisfy the lease's continuous development requirement.

After presiding over a bench trial based on stipulated facts, the trial court rendered judgment in favor of Chesapeake and against CBR. Upon CBR's request, the trial court issued findings of fact and conclusions of law. The trial court found that the lease was unambiguous, that the lease's primary term expired January 26, 2010, and that "[t]he parties stipulated and the facts confirm that continuous development . . . has occurred with no lapse in the time period required for continuous development." Based on its findings, the trial court concluded that "there has been no partial termination of the [lease]" and that "[lease] . . . remains valid and in effect as to all of the Leased Lands in Block 2 . . . so long as [Chesapeake] engages in a continuous development program with no lapse in the time period provided."

## STANDARD OF REVIEW

Because the trial court's decision was based upon stipulated facts and the construction of an unambiguous oil and gas lease is a question of law, the standard of review is *de novo*.[4] *See Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)(holding that the construction of an unambiguous deed is a question of law); *Karm v. City of Castroville*, 219 S.W.3d 61, 63 (Tex.App.--San Antonio 2006, no pet.)(holding that if issues involve stipulated facts and questions of law only, the standard of review is *de novo*.); *Anadarko Petroleum Corp. v. BNW Property Co.*, 393 S.W.3d 846, 849 (Tex.App.--El Paso 2012, pet. denied) (same).

## LEASE CONSTRUCTION

The primary duty of the court in interpreting an oil and gas lease is to ascertain the parties' intent as expressed within the four corners of the lease. *See Luckel*, 819 S.W.2d at 461. In

_____
[4] The parties agree that the deed is not ambiguous.

seeking to ascertain the parties' intent, the court must attempt to harmonize all parts of the lease, even if different parts of the lease appear contradictory or inconsistent. *See Luckel*, 819 S.W.2d at 461-62. Construing the lease to give effect to all of its provisions honors the parties' intent that every clause has some effect and in some measure evidences their agreement. *See id.* at 462. Accordingly, the court should not strike down any part of the lease, unless there is an irreconcilable conflict wherein one part of the lease destroys in effect another part thereof. *See id.* (internal quotation marks omitted).

## HORIZONTAL PUGH CLAUSE

In its first issue, CBR contends that the horizontal Pugh clause terminated the mineral rights to the undeveloped, deep-lying formations in Block Two because production in paying quantities has not been obtained from these formations when the lease's primary term ended. We disagree.

### *Applicable Law*

The general rule is that an oil and gas lease is indivisible by its nature. *See Shown v. Getty Oil Co.*, 645 S.W.2d 555, 560 (Tex.App.--San Antonio 1982, writ ref'd). Ordinarily, production from, or other operations on, any part of the land included in an oil and gas lease will perpetuate the lease beyond the primary term as to all of the land covered by the lease. *See SMK Energy Corp. v. Westchester Gas Co.*, 705 S.W.2d 174, 176 (Tex.App.--Texarkana 1985, writ ref'd n.r.e.).

A Pugh clause, however, restricts the extent to which drilling a producing well within a unit perpetuates a lease included in the unit. *Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207, 1209 (5th Cir. 1992). The Pugh clause was created "to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion[,]" and the clause is

designed to "foster[ ] reasonable development of leased property."  *Sandefer Oil & Gas, Inc.*, 961 F.2d at 1209.   In general, a horizontal Pugh clause holds a lease only to the stratum or level from which production has been secured in the unit during the primary term of the lease and, thus, frees the mineral interests below that depth absent additional development.  *Id.* at 1210-11; *Rogers v. Westhoma Oil Company*, 291 F.2d 726, 733-34 (10th Cir. 1961).

## *Discussion*

Contrary to CBR's contention on appeal, the lease's horizontal Pugh clause never sprang into life.   By its terms, the Pugh clause operates "[a]t the expiration of the Primary Term or the conclusion of the continuous development program[.]"   The language used by the parties in a lease should be accorded its plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated.  *See Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985); *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966).   The term "or" is disjunctive, or alternative in its effect.  *Lyons*, 701 S.W.2d at 643; *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Ins. Co. of Tex.*, 142 Tex. 630, 180 S.W.2d 906, 908 (1944); *Shell Petroleum Corp. v. Royal Petroleum Corp.*, 135 Tex. 12, 137 S.W.2d 753, 758 (1940).   In other words, in its disjunctive nature, "or" expresses a choice between two mutually exclusive possibilities. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 872 (11th ed. 2009).

When the term "or" is accorded its plain, grammatical meaning as a disjunctive expressing a choice between two mutually exclusive possibilities, the Pugh clause operates at two mutually exclusive stages: *either* "[a]t the expiration of the Primary Term" *or* "the conclusion of the continuous development program."   Here, as was noted above, the trial court found that "continuous development . . . has occurred with no lapse in the time period required for continuous

6

development." Accordingly, because there has been no cessation of continuous development, the horizontal Pugh clause has not sprung into life.

CBR maintains that by its express terms, the Pugh clause operates "at both the expiration of the primary term as well as the conclusion of the continuous development program." In other words, CBR contends that the term "or" means "and." According to CBR, the conjunctive meaning is more appropriate because otherwise the horizontal Pugh clause "could never become operative at the end of the primary term" "for the simple reason that without production at the end of the primary term, the habendum clause, not the Horizontal [Pugh clause], operates to terminate the lease." But CBR is mistaken.

First, CBR's suggested construction would fail to give effect to all of the lease's provisions. The lease's habendum clause reflects the general principle that production from any part of the land included in an oil and gas lease will perpetuate the lease beyond the primary term as to all of the land covered by the lease. The habendum clause, however, also recognizes that this general principle is subject to modification by other contractual provisions in the lease, including the producing-acreage and continuous-development clauses. Both of these clauses address what occurs to undeveloped acreage—acreage not included in producing units or in units on which drilling has commenced—at the end of the lease's primary term. Pursuant to these clauses, the lease terminates to such acreage unless the lessee "commences a continuous development program on the undeveloped Leased Land" by drilling within a specific period of time and completing a developmental well within a specific period of time. Furthermore, pursuant to the continuous-development clause, the lease "terminate[s] as to all the undeveloped acreage at such time as Lessee fails [sic] continuously develop . . . ." Thus, when these clauses

7

are harmonized and construed so that each has some effect, the result is that the horizontal Pugh clause can and will operate at the end of the primary term if production in paying quantities exists but no continuous development program is in place.

Second, CBR's suggested construction makes little commercial sense.   As recognized in *Sandefer Oil & Gas*, the Pugh clause was created not only to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion, but also to foster reasonable development of leased property.   961 F.2d at 1209.   "If the lessee is required to reasonably develop the premises but, once having drilled a well to production on one spacing unit, is faced with the prospect of having the Pugh clause terminate the lease as to any other lands except those on which the lessee might be drilling when the primary term expires, the lessee is faced with either drilling on all possible spacing units at one time or forfeiting the lease on those spacing units on which drilling is not commenced at the expiration of the primary term."   *Egeland v. Continental Resources, Inc.*, 616 N.W.2d 861, 870 (N.D. 2000).   "Presumably a lessee will be disinclined to continue to develop a lease if the non-drilled portion of the lease will expire regardless of development during the extended primary term."   *Id*.

CBR's first issue is overruled.

## SEPARATE PRORATION UNIT LEASES

In its second and final issue, CBR argues that upon the primary term's expiration, the lease's "severance" clause segregated Block Two into seventeen producing units each governed by a separate lease that, in conjunction with the horizontal Pugh clause, limited the operation and effect of the continuous-development clause to the confines of each producing unit so that the clause operated only within each unit, rather than on a lease-wide basis.   According to CBR, since

8

Chesapeake was not engaged in the continuous development of these seventeen producing units, the Pugh clause terminated the lease rights to the undeveloped formations lying below those seventeen units. We disagree.

### *Discussion*

Contrary to Chesapeake's assertion, the lease's severance clause was not triggered when the lease's primary term expired. In relevant part, the severance clause provides:

> Notwithstanding anything to the contrary contained herein: (i) during and after expiration of the Primary Term . . . the provisions of this Lease shall be separately applicable to each of the Blocks . . . so that each [block] . . . shall be considered as being covered by and constituting a separate lease for all purposes herein; and (ii) from and after the expiration of the Primary Term . . . and any extension of the Primary Term as provided in Paragraphs 2A and 3.F, the provisions of this Lease shall be separately applicable to each proration unit . . . and each such proration unit shall be considered as being covered by a separate lease for all purposes herein.

In turn, the habendum clause defines the "Primary Term" as:

> **PRIMARY TERM:** It is agreed that this lease shall remain in force for a period of three (3) years or five (5) years if extended by the option contained in Section 2A below (hereinafter referred to as the 'Primary Term'), from the date first written above and as long thereafter as . . . [hydrocarbons] . . . [are] producing or capable of producing in paying quantities (as defined below) from said Leased Land by the Lessee, subject to the provision of Section 3 set forth herein.

Paragraph 2A provides that the "Lessors grant and convey to Lessee an option to extend the primary term of any or all of the four (4) separate Oil and Gas Leases created herein under for a period of two (2) additional years." Paragraph 3.F is the continuous-development clause set forth above. It provides in relevant part that: "This Lease shall terminate as to the undeveloped Leased Land at the expiration of the Primary Term of this Lease unless Lessee commences a continuous development program on the undeveloped Leased Land in accordance with the terms and provisions hereinafter set forth."

9

By its plain, grammatical terms, the severance clause is triggered "after expiration of the Primary Term . . . *and* any extension of the Primary Term as provided in Paragraphs 2A *and* 3.F[.]" The participle "and" is conjunctive. *Guardian Life Ins. Co. of Tex.*, 180 S.W.2d at 908. "The conjunctive 'and' expresses the general relation of connection or addition, especially combination . . . and signifies something to follow, expressing the idea that what follows is added and taken along with the first." *Int'l Sec. Life Ins. Co. v. Arant*, 463 S.W.2d 523, 525-26 (Tex.Civ.App.--Amarillo 1971, writ ref'd n.r.e.). Accordingly, the plain language of the severance clause provides that the lease's primary term is extended by continuous development and that severance will not occur until after the expiration of the extended primary term. As was reiterated above, the trial court found that there has been no cessation of continuous development. Because continuous development has not ceased, the severance clause has not been triggered.

CBR contends that because Chesapeake judicially admitted that the primary term expired on January 26, 2010, Chesapeake is precluded from claiming that the primary term was extended by the continuous development clause. In making this argument, CBR relies on *Fisher v. Walker*, 683 S.W.2d 885 (Tex.App.--El Paso 1985, writ ref'd n.r.e.). CBR's reliance on *Fisher* is misplaced.

The issue in *Fisher* was the divisibility of a lease absent production in accordance with the lease's Pugh clause.[5] 683 S.W.2d at 886. That clause mandated that commercial production was required on each proration unit to extend lease term as to that unit. *Id*. The appellant argued that the Pugh clause terminated the lease as to each proration unit which did not have a completed well within its confines. *Id*. at 887. The appellees contended that production on each of the ten tracts

---

[5] Though the Court in *Fisher* did not label the clause in issue there as a Pugh clause, the Court treated it as one. Benjamin Robertson, *Top Lease Vultures: Title Failure, Bad Faith Pooling, and The Validity of Top Leases in The Texas Shale Plays*, 44 TEX. TECH L. REV. 463, 478 n.127 (2012).

was sufficient to hold the entire lease.  *Fisher*, 683 S.W.2d at 887.   In so contending:

> [The] [a]ppellees focus[ed] on the literal language of [the Pugh clause] which state[d] that the Paragraph terminates the lease 'from and after the expiration of the primary term, as the same may be extended under the provisions of Paragraph 2,' and they argue[d] that this provision restrict[ed] the termination provision of [the Pugh clause] to the period of time after an extended primary term.   [The] [a]ppellees urge[d] that Paragraph 2 (the habendum clause) define[d] the 'primary term' of their lease as not being merely the stated number of years given in this clause, but as also including the period of time which may be extended by production.   Therefore, [the] [a]ppellees contend[ed] that since they [were] still operating in an extended primary term, [the Pugh clause] ha[d] not yet become operable.

*Id.* at 887.

This Court rejected the Appellees' contention, concluded that the construction urged by them would render the Pugh clause meaningless because it would spring into life only after non-production, by which point the lease would have already been terminated given that only production after the expiration of the primary term held the lease.   *Id*. at 888.

At first blush, *Fisher* seems to support CBR's position on appeal.   But *Fisher* is distinguishable.   Here, there is no fear that the severance clause would be rendered meaningless by springing into life only after the lease had already been terminated because, unlike *Fisher*, production is not the only manner by which the lease is held after the expiration of the primary term.   Pursuant to the lease's continued-development clause, the lease does not terminate at the expiration of the primary term if the lessee commences a continuous development program.   Moreover, the severance clause here has meaning because it provides for the divisibility of the lease regardless of production.   By its very terms, the severance clause makes the lease divisible if the lessee does not enact a continuous development program or, if enacted, fails to comply with its requirements.

11

CRB's second issue is overruled.

## CONCLUSION

Because we hold that the trial court correctly concluded that the lease did not terminate under the circumstances of this case, we affirm the trial court's judgment.


November 6, 2013

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.