2014 ND 123

**Greggory G. TANK, Plaintiff and Appellee**

v.

**CITATION OIL & GAS CORP., Citation 2004 Investment Limited Partnership, Northern Oil and Gas, Inc., Otter Creek, LLC, G.G. Rose, LLC, Ralph Cuellar and Sylvia Cuellar, DJB Investment Company, LLC, Kevin P. Doyle, Cyan Brakhage, Barbara Boaz, Margaret Sumter, Petro–Hunt, L.L.C., Pillar Energy, LLC, Sasrana Oil and Gas, Howard Gray, Linda Goldner, Scot Farber, Paladin, Inc., Thomas Family Limited Partnership, BB Management, LLC, Magic Merlin Energy Investments, LLC, Blue Ridge Energy, LLC, BF Energy, LLC, M Code, LLC, J and J Energy, LLC, Jim**

Whitehead Oil & Gas, LLC, and other persons/companies "John Doe" whose interest does not appear of record, Defendants

Citation Oil & Gas Corp., Citation 2004 Investment Limited Partnership, Northern Oil and Gas, Inc., Otter Creek LLC, G.G. Rose, LLC, Ralph Cuellar and Sylvia Cuellar, DJB Investment Company, LLC, Kevin P. Doyle, Cyan Brakhage, Barbara Boaz, Margaret Sumter, Sasrana Oil and Gas, Howard Gray, Linda Goldner, Scot Farber, Paladin, Inc., Thomas Family Limited Partnership, BB Management, LLC, Magic Merlin Energy Investments, LLC, Blue Ridge Energy, LLC, BF Energy, LLC, M Code, LLC, J and J Energy, LLC, and Jim Whitehead Oil & Gas, LLC, Petro–Hunt, L.L.C. and Pillar Energy, LLC, Appellants.

No. 20130375.

Supreme Court of North Dakota.

June 24, 2014.

Rehearing Denied July 17, 2014.

Ariston E. Johnson (argued) and Dennis E. Johnson (appeared), Watford City, N.D., for plaintiff and appellee.

Jillian R. Rupnow (argued), Amy DeKok (appeared), and Lawrence Bender (on brief), Bismarck, N.D., for defendants and appellants Citation Oil & Gas Corp., Citation 2004 Investment Limited Partnership, Northern Oil and Gas, Inc., Otter Creek, LLC, G.G. Rose, LLC, Ralph Cuellar and Sylvia Cuellar, DJB Investment Company, LLC, Kevin P. Doyle, Cyan Brakhage, Barbara Boaz, Margaret Sumter, Sasrana Oil and Gas, Howard Gray, Linda Goldner, Scot Farber, Paladin, Inc., Thomas Family Limited Partnership, BB Management,

LLC, Magic Merlin Energy Investments LLC, Blue Ridge Energy, LLC, BF Energy, LLC, M Code, LLC, J and J Energy, LLC, Jim Whitehead Oil & Gas, LLC.

John W. Morrison, Jr. (on brief) and Paul J. Forster (on brief), Bismarck, N.D., for defendants and appellants Petro–Hunt, L.L.C. and Pillar Energy, LLC.

VANDE WALLE, Chief Justice.

[¶ 1] Citation Oil & Gas Corp., Petro–Hunt LLC, and other working interest owners (collectively "defendants") appealed from a district court summary judgment quieting title to an oil and gas lease in Greggory Tank. We affirm, concluding as a matter of law the lease expired on a portion of the property under the facts of this case.

I

[¶ 2] In 1982, George and Phyllis Tank executed an oil and gas lease in favor of Petro–Lewis Funds, Inc., covering property in McKenzie County described as the northwest quarter and south half of section 10, township 151 north, range 96 west. The lease had a three-year primary term expiring in September 1986. In July 1986, George and Phyllis Tank executed a Ratification of Oil and Gas Lease, Settlement Agreement, and Stipulation, agreeing to ratify, adopt, and confirm the lease. The parties agreed to extend the primary term of the lease for three more years, ending July 15, 1989.

[¶ 3] In May 1983, the Tank 3–10 well was spudded in the northwest quarter. The well produced until October 1996. In June 1998, the Tank 3–10R well was spudded and replaced the Tank 3–10 well in the northwest quarter of the property. The Tank 3–10R well continues to produce oil or gas.

[¶ 4] In June 1988, the Tank 13–10 well was spudded in the southwest quarter. The well continuously produced oil or gas until October 2008, and intermittently produced oil or gas until January 2012.

[¶ 5] On November 21, 2008, the North Dakota Industrial Commission granted an application filed by Petro–Hunt to create a 1280–acre spacing unit encompassing sections 3 and 10 of township 151 north, range 96 west. The spacing unit includes all of the leased property. On October 30, 2009, Petro Hunt's application for a permit to drill a horizontal well in the 1280–acre spacing unit was approved. In February 2010, the Jonsrud 151–96–3B–10–2H well was spudded in section 3. The Jonsrud well is currently producing. In October 2010, the George Tank 151–96–10C–3–3H well was spudded in section 10 and is currently producing.

[¶ 6] Tank is the successor in interest to George and Phyllis Tank and is the owner of minerals in the southwest quarter of section 10. In September 2011, Tank sued the defendants, seeking to cancel the oil and gas lease to the extent it covers the southwest quarter. The defendants moved for summary judgment, seeking dismissal of all of Tank's claims. The defendants argued the continued drilling and operation of oil and gas wells on the leased property maintained the lease beyond the primary term and the lease remains in full force and effect. Tank responded and filed a cross-motion for summary judgment, arguing the lease expired on the southwest quarter of the property under the Pugh clause in the lease due to a lack of continued production on that quarter.

[¶ 7] The district court denied the defendants' motion for summary judgment, ruling the lease had expired and was no longer valid on the southwest quarter. The court determined summary judgment was appropriate because there were only

issues of law to resolve, including the interpretation of an unambiguous contract and the application of undisputed facts. The court concluded the Pugh clause applied for subsequent and successive one-year periods after the primary term expired, it clearly and explicitly directed a division of the lease into several parts, and it directed that production on pooled portions would not apply to non-pooled non-producing portions. The court also concluded that lands not included in a producing unit were separate and distinct from other lands described in the lease and that non-producing lands must have drilling operations conducted on undeveloped portions of that land during each one-year period to avoid expiration of the lease on those lands. The court further concluded each producing division is separate and distinct and must be considered separately when deciding whether the lease continued. The court determined production on the Tank 13–10 well in the southwest quarter ceased on October 1, 2008, and October 30, 2009, was the earliest date drilling could have commenced in the new spacing unit that included the southwest quarter. The court ruled none of the savings clauses in the lease extended the lease until October 30, 2009, when drilling operations began on the new spacing unit, and none of the clauses prevented the lease from expiring on the southwest quarter. Judgment was entered quieting title to the lease on the southwest quarter in favor of Tank.

## II

■■ [¶ 8] Our standard for reviewing a district court's decision granting summary judgment under N.D.R.Civ.P. 56 is well-established:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.... Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record.

*Estate of Christeson v. Gilstad,* 2013 ND 50, ¶ 6, 829 N.W.2d 453 (quoting *Golden v. SM Energy Co.,* 2013 ND 17, ¶ 7, 826 N.W.2d 610).

■■ [¶ 9] There are no disputed issues of material fact in this case. The sole question on appeal involves the interpretation of the lease. The general rules governing interpretation of contractual agreements apply to the interpretation of oil and gas leases. *Egeland v. Continental Res., Inc.,* 2000 ND 169, ¶ 10, 616 N.W.2d 861. "The construction of a written contract to determine its legal effect is a question of law for the court to decide, and on appeal, this Court will independently examine and construe the contract to determine if the [district] court erred in its interpretation of it." *Id.*

■■ [¶ 10] Contracts, including oil and gas leases, are interpreted to give effect to the parties' mutual intent at the time of contracting. N.D.C.C. § 9–07–03. The parties' intent is ascertained from the writing alone if possible. N.D.C.C. § 9–07–04. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." N.D.C.C. § 9–07–02. Words in a contract are construed in the ordinary and popular sense, unless the parties use the words in a technical sense or give the words special meaning. N.D.C.C. § 9–07–09; *Egeland,* 2000 ND 169, ¶ 10, 616

N.W.2d 861. Technical words are interpreted as usually understood by people in the profession or business to which they relate, unless they are clearly used in a different sense. N.D.C.C. § 9–07–10. "A contract must be read and considered in its entirety so that all of its provisions are taken into consideration to determine the true intent of the parties." *Egeland*, at ¶ 10; *see also* N.D.C.C. § 9–07–06. We attempt to give effect to every clause, sentence, and provision in a contract. *Rolla v. Tank*, 2013 ND 175, ¶ 7, 837 N.W.2d 907.

### III

[¶ 11] The defendants argue the district court erred in granting summary judgment because the court misinterpreted the terms of the lease by concluding the Pugh clause severed the lease and allowed the lease to expire on the southwest quarter. They contend the lease on the entire property was sustained under the drilling operations clause and the Pugh clause did not apply.

### A

■■ [¶ 12] An oil and gas lease is generally indivisible by nature, and production or other operations on any part of the land will generally maintain the lease beyond the primary term for all of the land covered by the lease. *Egeland*, 2000 ND 169, ¶ 16, 616 N.W.2d 861. In this case, the drilling operations clause provides that the lease will remain in force after the expiration of the primary term if there is production or other operations:

> Notwithstanding anything in this lease contained to the contrary, it is expressly agreed that if Lessee shall commence operations for drilling at any time while this lease is in force, this lease shall remain in force and its terms shall continue so long as operations are continuously prosecuted and, if production results therefrom, then as long as production continues. As used in this lease continuously prosecuted shall mean that not more than thirty days shall elapse without operations on any well or that not more than ninety days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well.

The plain language of this clause states the lease will remain in force and its terms will continue as long as drilling operations are continuously prosecuted and, if production results from the operations, then as long as production continues. Under this type of clause, production or other drilling operations anywhere on the property generally extends the lease for all of the leased property. *See Egeland*, at ¶ 16. The term "production" is not defined in the lease, but when it is used in similar clauses in oil and gas leases it is generally interpreted to mean "production in paying quantities, that is, production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss." 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law Manual of Terms* 816 (2013).

[¶ 13] In this case, production resulted from the drilling operations. When the primary term expired the Tank 3–10 well was producing in the northwest quarter and the Tank 13–10 well was producing in the southwest quarter. The district court interpreted production using the above definition and found that production on the Tank 13–10 well ceased in October 2008. The defendants do not dispute this finding. The Tank 3–10 well was replaced with the Tank 3–10R well in June 1998, and the

Tank 3–10R well continues to produce oil or gas. There has been a producing well located on the leased property and production has been continuous since before the primary term expired. Under the plain language of the drilling operations clause, the lease on all of the leased property remained in force and its terms continued as long as production continued.

### B

[¶ 14] However, the lease also contains a Pugh clause and the district court concluded the Pugh clause severed the lease allowing it to become divisible and allowing the lease on the southwest quarter to expire. A Pugh clause "generally provides for a severance of the lease where less than all of the leasehold is included in a single unit," but it can vary widely in form. *Egeland*, 2000 ND 169, ¶ 17, 616 N.W.2d 861. The purpose of the clause is to "protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion" and is designed to "foster[ ] reasonable development of leased property." *Id.* (quoting *Sandefer Oil & Gas, Inc. v. Duhon*, 961 F.2d 1207, 1209 (5th Cir. 1992)). A Pugh clause cannot arise by implication and must "clearly and explicitly direct a division of the lease into several parts." *Egeland*, at ¶ 17.

[¶ 15] The Pugh clause in this case provides:

Nothwithstanding any provision in this lease to the contrary, if, at the end of the one year period from the end of the primary term hereof, this lease is maintained in full force and effect by virtue of production of oil and/or gas, this lease shall nevertheless expire as to all that part of said lands not included in a producing unit unless operations for the drilling of a well have been conducted during such one-year period. Lessee may continue to hold this lease in full force and effect as to all of said lands for subsequent and successive periods of one year by conducing [sic] additional drilling operations on undeveloped portions of said lands during each preceding one-year period. Should Lessee fail to conduct drilling operations during any such one-year period, then this lease shall expire as to said lands not included in producing units at the end of the one-year period during which no drilling operations were conducted. The term "producing unit" as used herein shall mean the following number of acres:

A. The number of acres in the drilling and spacing unit allocated to each producing well as determined by the appropriate governing body of the State of North Dakota.

B. In the absence of rules and regulations promulgated by the appropriate state governing body, the number of acres in a producing unit for each producing well shall be approximately one hundred and sixty as to oil or six hundred forty as to gas.

[¶ 16] The defendants argue the court misinterpreted the Pugh clause and erred in holding the clause was operative at all times following the end of the primary term. They claim the Pugh clause clearly and explicitly states that it is only operative at the end of a one-year period following the end of the primary term and that the conditions for the clause to allow the lease to expire on the southwest quarter were not met because the southwest quarter was included in a producing unit at that time. Quoting the first sentence in the clause, they contend the express language of the clause makes it a one-time only Pugh clause that was only operative on July 15, 1990, one year after the end of the primary term on July 15, 1989, and the lease for the northwest and southwest

quarters was held by production of oil or gas.

[¶ 17] We agree the first sentence of the clause states the lease will expire "at the end of the one year period from the end of the primary term" for any part of the property that is not included in a producing unit unless drilling operations have been conducted within the prior year. The plain language of the first sentence of the Pugh clause states that if the lease remains in full force and effect by virtue of production of oil or gas at the end of the one-year period after the expiration of the primary term, the lease will still expire for all portions of the leased property not included in a producing unit, unless operations for drilling a well were conducted during the previous year. However, the defendants fail to consider the rest of the paragraph. When the entire provision is read as a whole it is clear the clause does not apply *only* at the end of the one-year period after the expiration of the primary term.

[¶ 18] The Pugh clause further states, "Lessee may continue to hold this lease in full force and effect as to all of said lands for subsequent and successive periods of one year by [conducting] additional drilling operations on undeveloped portions of said lands during each preceding one-year period." This sentence provides that the lease will remain in full force and effect for one-year terms for all of the leased property when the lease was sustained by production and drilling operations under the terms of the first sentence as long as the lessee conducts additional drilling operations on undeveloped portions of the land during each one-year period. The lease does not specifically define "undeveloped" land, but in the oil and gas industry, "developed" land generally means land that has a completed well capable of producing oil or gas in paying quantities. *See* 8

Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law Manual of Terms* 258 (2013); *see also Adolph v. Stearns*, 235 Kan. 622, 684 P.2d 372, 377–78 (1984); Ariz.Rev.Stat. § 27–501(5) (2013). Undeveloped land as used in the lease is land that does not have a completed well capable of producing oil or gas in paying quantities. This sentence in the clause states that the lease will continue for one-year terms for all of the leased property as long as the lessee conducts additional drilling operations on undeveloped portions of the land.

[¶ 19] The Pugh clause further states, "Should Lessee fail to conduct drilling operations during any such one-year period, then this lease shall expire as to said lands not included in producing units at the end of the one-year period during which no drilling operations were conducted." Like the first sentence, this sentence states the lease will expire on portions of the property that are not included in a producing unit when additional drilling operations on undeveloped land are not conducted during the one-year term.

[¶ 20] The Pugh clause expressly severs the lease and provides that the lease will expire on land not included in a producing unit when drilling operations are not conducted on undeveloped land during each one-year term after the primary term expires. The clause divides the land into producing units and land not included in a producing unit. The clause directs that production in a producing unit alone will not hold the lease on the lands not included in a producing unit. The clause clearly and explicitly directs a division of the lease into several parts and directs that production in a producing unit does not constitute production on the portion of the land that is not included in a producing unit.

[¶ 21] The Tank 3–10 well in the northwest quarter and the Tank 13–10 well in

southwest quarter were both producing oil or gas on July 15, 1990, one year after the primary term expired. The lease remained in full force and effect on both the northwest and southwest quarters at that time under the Pugh clause.

[¶ 22] While the lease remained in full force and effect for the northwest and southwest quarters after the primary term expired, the lease continued for one-year terms. At the end of each one-year term, the lease would expire for lands that were not included in a producing unit unless additional drilling operations were conducted on undeveloped portions of the leased property during the one-year term. The district court noted the undisputed facts established that the Tank 13–10 well, located in the southwest quarter, stopped producing oil and gas in paying quantities in October 2008. At that point, the southwest quarter was required to be included in a producing unit for another well or the lessee was required to conduct drilling operations during the one-year term of the lease to prevent the lease from expiring on July 15, 2009.

[¶ 23] Under the terms of the lease, a "producing unit" is "[t]he number of acres in the drilling and spacing unit allocated to each producing well as determined by the appropriate governing body of the State of North Dakota" or approximately one hundred and sixty acres for oil wells in the absence of the state governing body's rules and regulations. Although the Tank 3–10R well was producing after the Tank 13–10 well stopped producing in paying quantities, the Tank 3–10R well was located in the northwest quarter and there is no evidence the southwest quarter was included in the Tank 3–10R well's producing unit. After the Tank 13–10 well stopped producing in paying quantities, the southwest quarter was no longer included in a producing unit.

[¶ 24] In November 2008, the North Dakota Industrial Commission granted Petro–Hunt's application to create a spacing unit encompassing Sections 3 and 10, including the southwest quarter of Section 10. Petro–Hunt's application for a drilling permit for the new spacing unit was not approved until October 30, 2009, and the defendants do not argue drilling operations began before this date. The district court observed that drilling operations began at the earliest on October 30, 2009, and the defendants do not dispute this observation. The wells in that unit were not spudded and the unit was not a producing unit until 2010.

[¶ 25] On July 15, 2009, when the one-year term expired, the southwest quarter was no longer included in a producing unit and there was no evidence drilling operations had been conducted during the prior year. The lease, therefore, expired on the southwest quarter under the terms of the Pugh clause. We conclude the district court did not err in determining the lease expired on the southwest quarter under the terms of the Pugh clause.

C

[¶ 26] The defendants argue the district court erred in failing to consider the analysis in *Egeland* examining the effect a Pugh clause had on a drilling operations clause to determine how to interpret the two clauses in this case. The defendants argue the entire lease was maintained by the drilling operations clause and the production by the wells located in both the northwest and southwest quarters has sustained the lease.

[¶ 27] Under the drilling operations clause, the lease on the entire leased property remained in force because production has been continuous since the primary term expired. Under the Pugh clause, however, the lease expired on the south-

west quarter on July 15, 2009, because it was not included in a producing unit at that time and drilling operations were not conducted during the one-year term of the lease. The Pugh and the drilling operations clauses both include language stating each clause applies notwithstanding any contrary provision in the lease. The clauses conflict and each clause includes language stating it supersedes and controls any contrary provisions.

 [¶ 28] To the extent possible, we interpret contracts to give effect to every provision of the contract if reasonably practicable. N.D.C.C. § 9–07–06; *see also Kortum v. Johnson*, 2008 ND 154, ¶ 44, 755 N.W.2d 432. An oil and gas lease is often construed most favorably to the lessor because the lessee usually drafts the lease and has more experience drafting the lease to give himself an advantage. *West v. Alpar Res., Inc.*, 298 N.W.2d 484, 490–91 (N.D.1980). Pugh clauses are generally included in a lease to protect the lessor. *Egeland*, 2000 ND 169, ¶ 17, 616 N.W.2d 861. If we interpret the Pugh and drilling operations clauses as the defendants advocate, the drilling operations clause would supersede the Pugh clause and the Pugh clause would become meaningless. If the drilling operations clause controls, the lease on the entire property would continue as long as production continues on any well on the property or as long as drilling operations were commenced while the lease was in force and continuously prosecuted if there were no producing wells, and the Pugh clause would never have any effect. Because we interpret contracts to give effect to every provision and Pugh clauses are included in a lease to protect the lessor, we conclude the Pugh clause modifies the drilling operations clause by terminating the lease on land not included in a producing unit when drilling operations are not conducted during the one-

year term. This interpretation gives effect to both provisions of the lease.

[¶ 29] The defendants contend our analysis of how the Pugh clause affects the drilling operations clause should be guided by our analysis in *Egeland*, in which they claim this Court held the drilling operations and Pugh clauses did not conflict and the drilling operations clause continued to operate leasewide despite the Pugh clause. They argue the Pugh clause in this case is similar to the clause in *Egeland*, and therefore the same analysis should apply, and they urge us to conclude the lease on all of the leased property was maintained by the drilling operations clause.

[¶ 30] In *Egeland*, the lease contained a drilling operations clause and a Pugh clause. The continuous drilling operations clause provided:

> If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises but lessee is then engaged in drilling operations, then this lease shall continue in force so long as drilling operations are being continuously prosecuted on the leased premises; and drilling operations shall be considered to be continuously prosecuted if not more than sixty days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If oil or gas shall be discovered and produced from any such well or wells drilled or being drilled at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas shall be produced from the leased premises.

*Egeland*, 2000 ND 169, ¶ 3, 616 N.W.2d 861. The Pugh clause stated, "A producing well, or well capable of production, will perpetuate this lease beyond its Primary Term ONLY as to those lands as are located within, or committed to, a produc-

ing or spacing unit...." *Id.* at ¶ 4. The lessor argued the Pugh clause conflicted with and overrode the drilling operations clause and the Pugh clause terminated the leases as to the land not committed to a producing spacing unit at the expiration of the primary term.

[¶ 31] This Court held there was no irreconcilable conflict between the Pugh and drilling operations clauses. *Egeland*, 2000 ND 169, ¶ 27, 616 N.W.2d 861. We held the Pugh clause was silent about continuous drilling operations, the Pugh clause stated a producing well extends the lease "ONLY" to land sharing in production, and "[t]he word 'ONLY' limits the lands held by production from a given well, not the methods for extending the lease.... we conclude the Pugh clauses did not terminate the Cenex leases as to those lands not committed to a producing spacing unit on March 8, 1996, and the leases could still be extended by continuous drilling operations." *Id.* We further held:

> We construe, as a matter of law, the continuous drilling operations clause to apply to the primary five-year term of the lease if drilling is ongoing and not more than 60 days have elapsed between completion or abandonment of one well and beginning operations for a subsequent well, and construe the Pugh clause to apply after the expiration of the primary term as extended to the entire lease by the continuous drilling operations clause.

*Id.* at ¶ 29. We declined to adopt the lessor's interpretation of the lease, stating:

> Under Egeland's construction of the effect of the Pugh clause, the lessee who has completed a producing well holds, in addition to the units containing producing wells, only the spacing units on which drilling operations have actually commenced at the expiration of the pri-

mary term. The lessee who has only commenced drilling a first well at the time of the expiration of the primary term would continue to hold the entire lease under the continuous drilling operations clause. We decline to construe the lease to reach such a result.

*Id.* at ¶ 30.

[¶ 32] Because Pugh clauses vary widely in form, the interpretation of how a Pugh clause may affect other provisions in a lease may also vary. The continuous operations and Pugh clauses in this case are different from those in *Egeland*, and therefore the same analysis does not apply. Here, the drilling operations clause maintains the lease on all of the leased property if drilling operations are commenced at any time while the lease is in force. The Pugh clause applies if the lease is maintained by production but, unlike the Pugh clause in *Egeland*, it also addresses drilling operations and provides that the lease on all of the property is maintained if additional drilling operations are conducted on undeveloped land during each one-year term. The lease on all of the property is maintained under both the drilling operations clause and Pugh clause when drilling operations are conducted on undeveloped land. The Pugh clause modifies the drilling operations clause by terminating the lease on land not included in a producing unit when additional drilling operations are not conducted on undeveloped land during the one-year terms after the primary term expires.

[¶ 33] The language of the lease in this case is different from the lease in *Egeland*, and therefore the same analysis does not apply. We conclude the Pugh clause modifies the drilling operations clause by terminating the lease on land not included in a producing unit when drilling operations are not conducted during the one-year term.

## IV

[¶ 34] We have considered any remaining arguments and we conclude they are without merit or do not affect the outcome of our decision. We conclude the lease expired on the southwest quarter under the terms of the Pugh clause and the district court did not err in granting Tank's motion for summary judgment. The summary judgment is affirmed.

[¶ 35] CAROL RONNING KAPSNER, LISA FAIR McEVERS, and DANIEL J. CROTHERS, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 36] I respectfully dissent.

[¶ 37] The lynchpin of the majority opinion is the flawed premise that equates "no longer producing" with "undeveloped." That's like saying a person who's had several children "the old-fashioned way" but stops having sex is a virgin.

[¶ 38] In the oil and gas lease, the Pugh clause provides, in part:

> [I]f, at the end of the one year period from the end of the primary term hereof, this lease is maintained in full force and effect by virtue of production of oil and/or gas, this lease shall nevertheless expire as to all that part of said lands not included in a producing unit unless operations for the drilling of a well have been conducted during such one-year period. Lessee may continue to hold this lease in full force and effect as to all of said lands for subsequent and successive periods of one year by [conducting] additional drilling operations on undeveloped portions of said lands during each preceding one-year period. Should Lessee fail to conduct drilling operations during any such one-year period, then this lease shall expire as to said lands not included in producing units at the end of the one-year period during which

no drilling operations were conducted. . . .

[¶ 39] In interpreting the lease, the majority states, at ¶ 18, "[T]he lease will remain in full force and effect for one-year terms for all of the leased property when the lease was sustained by production and drilling operations under the terms . . . as long as the lessee conducts additional drilling operations *on undeveloped portions of the land* during each one-year period." (Emphasis added.) I agree with this statement by the majority; however, I cannot concur with the majority's interpretation of "undeveloped" land as contained within the lease.

[¶ 40] Citing a few separate authorities, the majority, at ¶ 18, defines "developed" land to generally mean "land that has a completed well capable of producing oil or gas in paying quantities." The majority, again at ¶ 18, then goes on to define undeveloped land, without citing any authority, as "land that does not have a completed well capable of producing oil or gas in paying quantities."

[¶ 41] "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, . . . ." N.D.C.C. § 9–07–09. Oil and gas leases are subject to the statutory rules of construction and interpretation. *See MacMaster v. Onstad,* 86 N.W.2d 36, 40 (N.D.1957).

[¶ 42] The problem with the majority's reasoning is that it allows land that has a previously, but no-longer, producing well to be classified as undeveloped land. This construction cannot reasonably be included under the ordinary and popular sense of the word "undeveloped." A review of oil and gas cases likewise demonstrates that "undeveloped land" cannot be construed in

the way the majority has defined it for this lease.

[¶ 43] A court in Texas recently explained how the Pugh clause in one oil and gas lease operated: "[T]he Pugh clause operates at two mutually exclusive stages: either '[a]t the expiration of the Primary Term' or 'the conclusion of the continuous development program.'" *Cmty. Bank of Raymore v. Chesapeake Exploration, L.L.C.*, 416 S.W.3d 750, 755 (Tex.App. 2013). In that same case, the court explained the meaning of "undeveloped acreage" as "acreage not included in producing units or in units on which drilling has commenced[.]" *Id.* The court explained the reasoning behind this construction: "As recognized in *Sandefer Oil & Gas*, the Pugh clause was created not only to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion, but also to foster reasonable development of leased property." *Id.* at 756.

[¶ 44] As the court recognized in *Chesapeake Exploration*, I would similarly conclude that the Pugh clause in this case can operate only at the expiration of the primary term or at the conclusion of a drilling or development program. "Undeveloped land" does not include land "in producing units or in units on which drilling has commenced." *See Chesapeake Exploration*, 416 S.W.3d at 755. The majority attempts to categorize as undeveloped land, land which has previously had a producing well. This classification is contrary to the authority cited above, and is contrary to logic. I would conclude that once a unit of land has had a producing oil well, a Pugh clause relating to "undeveloped land" cannot operate to end the oil and gas lease with regard to that unit.

[¶ 45] In this case, there was a producing well which stopped producing oil and gas in paying quantities in October 2008.

In November 2008, the North Dakota Industrial Commission granted Petro–Hunt's application to create a spacing unit which included this particular unit. Petro–Hunt's application for a drilling permit for the new spacing unit was not approved until October 2009. The wells were spudded and producing in 2010. The majority concluded that on July 15, 2009, the lease expired on that land under the terms of the Pugh clause. The majority's construction of the lease is not reasonable under the law, or under the facts of this case. I would conclude the lease continued.

[¶ 46] DALE V. SANDSTROM